975 A.2d 240

**Christian Darrell LEE**

v.

**STATE of Maryland.**

**No. 270, Sept. Term, 2008.**

Court of Special Appeals of Maryland.

July 7, 2009.

---

634

Piedad Gomez (Nancy S. Forster, Office of the Public Defender, on the brief), Baltimore, for appellant.

Ryan R. Dietrich (Douglas F. Gansler, Office of the Atty. Gen., on the brief), Baltimore, for appellee.

Panel: KRAUSER, C.J., DAVIS, and GRAEFF, JJ.

GRAEFF, Judge.

A jury sitting in Baltimore County convicted Christian Darrell Lee, appellant, of first-degree felony murder, first-degree burglary, two counts of first-degree assault, three counts of use of a handgun in the commission of a felony, and three counts of use of a handgun in the commission of a crime of violence. The court sentenced appellant to life imprisonment on the first-degree felony murder conviction, 25 years on each of the two first-degree assault convictions, and 20 years on each of the three convictions for use of a handgun in a crime of violence convictions.[1] The sentences were consecutive, resulting in an aggregate sentence of life imprisonment, plus 110 years.

Appellant presents the following issues on appeal:

1. Did the court err in denying appellant's motion to suppress his statements to the police?

2. Did the trial court err in refusing to instruct the jury on second-degree murder and involuntary manslaughter?

3. Did the trial court err in responding to a question from the jury during deliberations?

4. Did the trial court err in granting the State's motion to join for trial the two cases against appellant?

For the reasons set forth below, we shall affirm appellant's convictions.

---

1. The court merged the first-degree burglary conviction into the felony murder conviction, and it merged the three convictions for use of a handgun in the commission of a felony into the convictions for use of a handgun in a crime of violence.

## FACTUAL AND PROCEDURAL BACKGROUND

On September 8, 2006, at approximately 9:30 p.m., Randy Hudson drove to pick up his daughter at the home of her grandparents, Anna and Eric Fountain. As Mr. Hudson approached the back door of the residence and inserted his key in the door, "some guy jump[ed] out from nowhere and grab [bed][him] from behind." The attacker forced Mr. Hudson into a headlock and dragged him into the alley behind the house. Two other men approached, one armed with a handgun. The men advised Mr. Hudson that he should be quiet, and they demanded his money. After the three men took approximately $3,000, Mr. Hudson broke free and attempted to run away, but he tripped on a manhole cover. The men caught Mr. Hudson, and they beat him. As a result of the physical assault, Mr. Hudson drifted in and out of consciousness.

Anna Fountain, who was sleeping on the couch in the living room with her granddaughter that night, testified that she woke up when she heard a noise in the house. She saw two men coming down the stairs. The men pointed a gun at Ms. Fountain and instructed her "not to look up at them." The men went out the back door, came back in, and then ran back upstairs. Each of the four times they did this, they pointed the gun at her and told her not to look at them. One of the men took Ms. Fountain's cell phone.[2] On the fourth trip into the house, they brought Mr. Hudson into the residence, kicked him, and dragged him upstairs.

After the men left, Ms. Fountain locked the back door. She ran upstairs and discovered her husband, Eric Fountain, who had been shot, and Mr. Hudson. Ms. Fountain went through Mr. Hudson's pockets, located his cell phone, and, at 10:57 p.m., called 9-1-1.

Officer Thomas Wehrle testified that he arrived at the scene in response to a call for a possible shooting, and he heard loud screams. The door to the residence was slightly ajar and he

---

2. Ms. Fountain testified that the "short" man took her cell phone.

saw Ms. Fountain on her knees, screaming and crying. Upon seeing the police officers, Ms. Fountain stated, "he's upstairs. Hurry." The police officers discovered two bodies on the second floor. Mr. Hudson was lying on his back, unresponsive, but alive. Mr. Fountain was unresponsive, and "[i]t appeared initially that he was deceased." Medical personnel arrived and pronounced Mr. Fountain dead. The medical examiner later determined the cause of death to be two gunshot wounds to Mr. Fountain's torso.

On September 29, 2006, at approximately 4:30 a.m., the Baltimore County Police arrested appellant.[3] Sergeant Marvin Haw transported appellant to police headquarters. Appellant stated: "[W]hat took so long? It's been, like, three weeks."

Detective Craig Schrott, a homicide detective with the Baltimore County Police Department, interviewed appellant later that day from approximately 12:47 p.m. to 2:10 p.m. The detective informed appellant of his *Miranda*[4] rights, including that "anything you say can and will be used against you in a court of law." Appellant waived these rights and agreed to speak with the detective without an attorney present. The first thing that appellant said was: "What I want to know is[,] who the hell put me in this situation?" The detective responded: "[Y]ou remember the incident, 'cause you were there that day, right?" Mr. Lee stated: "I'm not stupid. I'm not stupid. I know what you're talking about."

Later in the interview, appellant acknowledged going into the Fountain residence. He stated, however, that he went into the house after Darnell Smith, his cousin, and John Satterfield. He initially stated that he did not know what was going on inside the house. He admitted going to the second floor of the house and seeing Mr. Fountain, who had been shot, but he denied hearing any gunshots and denied that he

---

**3.** The police received a tip from an informant named Chelene.

**4.** *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

knew "who did it." Appellant denied that he was with Darnell when the shooting took place.

Soon thereafter, Detective Schrott advised that he knew that appellant shot Mr. Fountain and explained why appellant would want to explain what happened:

[DETECTIVE:] But reason—has a difference, bud, in the end. It really does. It makes a difference to you; it makes a difference to that man's[ ] family. It makes, it makes a difference. It, it really does. Now, if you were cold-blooded and you went in there and you didn't care, this is what happened, so be it. But I can see that's not it. I mean, that, that's not even an option with you. I can see that. You got a heart. You got humanity to you. I think it's one of the things that just happened, you can't explain it. A bad decision to go inside that house.

You didn't even have a gun when you went up there. Your cousin were [sic] to go back outside, because he was upset because there wasn't any money upstairs, like [Mr. Hudson] said, and he gave you the gun and asked [ ] you [to] watch that man—and if that man would have just stayed in the bed, I have no doubt, no doubt in my mind you and I would have never met. Isn't that true?

[APPELLANT:] Oh, my God.

[DETECTIVE:] What's important—well, it's important for you, Chris; it's[ ] important for everybody. You don't[ ] want to be seen as coldblood[ed]. I know[ ] you're not. But you got to give an explanation. I mean, you're the only[ ] one that was up there when it happened, you know.

[APPELLANT:] (Witness shaking head no.)

[DETECTIVE:] I mean, if you don't tell the story, nobody's going to tell you it. And it just sounds—it's like reading a newspaper, you know. The two of you were upstairs. Darnell gives you the gun. He goes downstairs, at which time that man's shot. Nobody really knows what happened up there. I mean, could have been where people are going to say, well, maybe he said hell with it, he just shot him 'cause he was pissed' cause there's no money up there. You

don't want people thinking that, you know. I think it was an accident. I—true, I do—I can look on your face and I know it was an accident. But I need you to tell me that. It's no doubt whether you did it or not. There's no doubt, Chris. The only question is the details. I think it's important for you to be able to get this off your shoulders. I can see how you're living with this. It's important for that man's family to know, too. There's a difference in a situation like that from being perceived as cold-blooded or a situation that just took an ugly twist by no fault of your own. That something just happened, and that's the reaction it was. Or, or if he struggled, if he reached for the gun, maybe you went to hit him with the gun and the gun went off. I mean, what happened?

The detective then asked several questions about Mr. Fountain's location to "get a better picture of what's going on, what you're going through." The following then occurred:

[DETECTIVE:]—is he standing up, or was he still in bed? Was he sleeping? Was he awake? Chris, bud—all right. Was he still in bed or did he get up?

[APPELLANT:] I'm going to jail, right?

[DETECTIVE:] We're not talking about jail right now.

[APPELLANT:] Just—that's what the whole thing is about.

[DETECTIVE:] That ain't what it's about. It's about getting to what the truth is, that's what it's all about. Now, was he still in bed, or did he get out of bed while your cousin was up there?

[APPELLANT:] He was still in bed.

When asked what happened, appellant told the detective that Mr. Satterfield advised that there was money under the bed. The interrogation continued:

[DETECTIVE:] John told you that. So—all right, sir—so when you got there, you went into that room, was that man awake; was he asleep?

[APPELLANT:] He was asleep.

[DETECTIVE:] He was asleep?

[APPELLANT:] Yeah, this is being recorded [somewhere, aint it?] [5]

[DETECTIVE:] This is between you and me, bud. Only me and you are here, all right? All right?

[APPELLANT:] I'm trying to put together fact and accept that my life is basically over.

Appellant then stated that he, not John Satterfield, was getting a murder charge. Detective Schrott explained that, for felony murder, a person who did not personally kill the victim would be guilty of murder if the killing occurred during a felony in which the person participated.

The detective then returned to questioning appellant about the events that transpired immediately prior to the shooting:

[DETECTIVE:] Are you guys—do you wake him up, or does your cousin wake him up looking for the money, or do you try to find the money without waking him up?

[APPELLANT:] First we look under the bed. He, he woke up when my cousin left, then he try to rush me. He got too close. I tried to run. I didn't see, I didn't see why. I try to get him away from me so I could leave.

[DETECTIVE:] So you were trying to get away?

[APPELLANT:] I, I thought, I thought a gunshot would scare him. I ain't know I hit him. I wasn't even looking.

[DETECTIVE:] How'd you shoot when you were running? I mean, did you shoot like over you shoulder?

[APPELLANT:] No. Like, like this (Indicating). 'Cause I was close, near the door; and he, he just kept coming. I shot two immediate times. It's not like I shot, went away, shot here. I shot. [T]wo immediate times.

According to appellant, he gave the gun back to his cousin after they left the house.

---

**5.** The text in brackets was not in the transcript of the statement, but the recorded interview in the record contains this additional statement by appellant, and the parties do not dispute that this was what appellant said.

On October 23, 2006, a grand jury indicted appellant for felony murder and other charges relating to the events that resulted in Mr. Fountain's death. Appellant was denied bail, and he remained incarcerated at the Baltimore County Department of Corrections pending trial.

On November 29, 2006, an inmate in the Baltimore County Detention Center volunteered information to law enforcement regarding this case. A "body wire" was placed on the inmate,[6] and it recorded a conversation between the inmate and appellant. During this conversation, appellant negotiated an agreement with the informant to murder Chelene Smith, a potential witness against him on the murder charge. Shortly after obtaining this recording, appellant was charged with soliciting the murder of Ms. Smith.

On July 16, 2007, the State filed a Motion for Joinder of Offense, seeking to join the case involving the crimes at the Fountain residence with the separate charge against appellant for soliciting the murder of a witness. The State argued that a joint trial was appropriate because the "evidence is mutually admissible," stating that "evidence of the Murder ... provides motive for the subsequent Solicitation to Commit Murder" and "[t]he evidence in [the Solicitation to Commit Murder case] provides evidence of the Defendant's consciousness of guilt for the Murder." On August 8, 2007, the circuit court granted the State's motion to join the two cases.

On August 27 and 28, 2007, the court held a hearing on appellant's motion to suppress his statement to Detective Schrott. Appellant argued that appellant's statement should have been suppressed because it was involuntary and it was taken in violation of *Miranda*. Appellant argued, among other things:

[W]hat you have is, in effect, an agreement that it's not going to be used. I mean, the first thing the Detective said is, Anything you say is going to be used against you. And

---

6. The detective described a "body wire" as "a band that goes around the chest or stomach area, and a digital recorder is placed ... underneath [ ] his clothing."

then he lies to him about it being recorded for the purpose of being used against him.

The State argued that the detective's statement was not improper, and that it did not impact appellant's willingness to be involved in the interrogation. The State argued that appellant voluntarily, knowingly, and intelligently waived his rights and gave a statement to the detective.

Prior to the State's argument, the court noted that it had "some concern that Detective Schrott basically vitiates the [*Miranda*] waiver about anything you say can be used against you when he says this is just between you and me...." Ultimately, however, at the conclusion of all the arguments the court denied appellant's motion, reasoning as follows:

The statement he makes is, this is being recorded, ain't it? The Detective does not directly answer that question by saying yes or no, but he certainly leaves the Defendant to believe that the conversation is just between the two of them, which was not true. But I do not think that [ ] it changed the Defendant's willingness to answer the questions in any way. Or violated his rights. So the Motion to suppress the Defendant's statement is denied.

On January 14, 2008, trial commenced. Tori Kucz testified that, on September 8, 2006, she was with her boyfriend, Mr. Satterfield; her friend, Chelene Smith; appellant; and his cousin, Darnell Smith.[7] Ms. Kucz testified that appellant, Mr. Satterfield, and Darnell left her and Chelene to go for a walk. After approximately 45 minutes to an hour, Ms. Kucz heard people running and saying, "[s]tart the car. Get in the fuckin' car. Start the car." She got into her car with Chelene, Darnell, and appellant. Appellant said: "I shot him, yo." He continued: "I didn't mean to. He came at the gun. I know, yo. I know. I didn't mean to shoot him. I think he's dead, yo. He turnt [sic] that color white, you know, the color white when they die, when somebody's dead. He turnt [sic] that

7. Chelene Smith and appellant's cousin, Darnell Smith, are not related. Throughout the remainder of this opinion, these individuals will be referred to by their first names to avoid confusion.

color white." They drove off and picked up Mr. Satterfield, who "started flippin' out on [Darnell] and [appellant]," swearing at them, telling them that they were dumb, and stating, that "nobody was supposed to get shot." Ms. Kucz testified that appellant "kept sayin' over and over ... he's that color white, yo. I think I really shot him. He came at the gun. I didn't mean to do it."

Ms. Kucz testified that they drove to Baltimore City and stopped at a 7–Eleven off of Bel Air Road. Appellant had a cell phone, which he wiped off and threw in the grass behind the convenience store.

Two police officers and a forensic technician testified regarding the initial response to the 9–1–1 call and the collection of evidence at the crime scene, including a shell casing that was discovered at the residence. A handgun was recovered from the house where Darnell was arrested.

Sergeant Mark Ensor, an expert in firearms identification with the Baltimore County Police, testified that the bullet removed from the victim's body, as well as the shell casing located at the crime scene, was fired from the handgun seized from Darnell's address.

Appellant testified in his own defense. Although acknowledging that he entered the Fountains' home, appellant denied shooting Mr. Fountain, hitting Mr. Hudson, threatening Ms. Fountain, and taking property from either Mr. Hudson or Ms. Fountain. Instead, appellant blamed his cousin, Darnell, for the crimes. Appellant testified that Darnell entered the Fountain residence armed with a handgun. He testified that he went to the house to see if Darnell "was all right or what he was doin[g]." Appellant went upstairs, and he saw his cousin looking under the bed for money. Appellant testified that his cousin admitted shooting Mr. Fountain, stating: "[H]e tried to rush me. I had to shoot him." Appellant acknowledged that he took the gun from his cousin at one point, and that he helped bring Mr. Hudson into the house, but he denied other involvement in the crimes.

With respect to his statement to the police, appellant testified that he confessed to shooting Mr. Fountain because Mr. Satterfield, purportedly a member of a powerful prison gang, threatened to kill him or his family if he did not admit to the police that he shot Mr. Fountain. With respect to the recorded negotiations with an informant regarding hiring a person to murder Chelene, appellant testified that he "wasn't serious." Rather, he was "just talkin' trash" and "[v]entin' [his] anger."

On January 17, 2008, the jury began deliberations. The jury returned a verdict the next day, finding appellant guilty of (1) first-degree felony murder of Mr. Fountain; (2) first-degree burglary of the Fountain residence; (3) two counts of first-degree assault of Mr. Hudson and Ms. Fountain; (4) three counts of use of a handgun in the commission of a felony relating to Mr. Fountain, Ms. Fountain, and Mr. Hudson; (5) and three counts of use of a handgun in the commission of a crime of violence, with the same three victims. The jury found appellant not guilty of solicitation to murder Chelene Smith.

This timely appeal followed.

## DISCUSSION

### I.

### Motion to Suppress

Appellant's first contention is that the circuit court erred in denying his motion to suppress the statement that he gave to the police following his arrest. This contention is based on an exchange between appellant and Detective Schrott, which occurred after appellant had waived his *Miranda* rights, and after some discussion of the events of the evening. This exchange was as follows:

[APPELLANT:] Yeah, this is being recorded [somewhere aint it?]

[DETECTIVE:] This is between you and me, bud. Only me and you are here, all right? All right?

Although the suppression court initially expressed "some concern" that the statement vitiated the *Miranda* waiver, it ultimately denied appellant's motion to suppress, stating:

> The statement he makes is, this is being recorded, ain't it? The Detective does not directly answer that question by saying yes or no, but he certainly leaves the Defendant to believe that the conversation is just between the two of them, which was not true. But I do not think that the, it changed the Defendant's willingness to answer the questions in any way. Or violated his rights. So the Motion to Suppress the Defendant's statement is denied.

An appellate court reviews the grant or denial of a motion to suppress by looking "to the record of the suppression hearing." *State v. Tolbert,* 381 Md. 539, 548, 850 A.2d 1192, *cert. denied,* 543 U.S. 852, 125 S.Ct. 263, 160 L.Ed.2d 85 (2004). The court accepts the factual findings of the circuit court unless clearly erroneous, and it reviews "the evidence and the inferences that may be reasonably drawn in the light most favorable to the prevailing party." *Rush v. State,* 403 Md. 68, 83, 939 A.2d 689 (2008). The appellate court, however, makes "an independent, constitutional appraisal of the record by reviewing the law and applying it to the facts of the case." *Shatzer v. State,* 405 Md. 585, 592, 954 A.2d 1118 (2008), *cert. granted,* —— U.S. ——, 129 S.Ct. 1043, 173 L.Ed.2d 468 (2009).

In arguing that the circuit court's ruling was erroneous, appellant characterizes Detective Schrott's statement as a "promise of confidentiality." Appellant argues that any subsequent statements he made should be suppressed because: (1) "[t]he detective's assurance of confidentiality contradicted the *Miranda* warning that anything he said could be used against him in court and therefore nullified the prior *Miranda* advisement"; and (2) the detective's statement "renders [appellant's] statements involuntary."

The State argues that the trial court properly denied the motion to suppress for several reasons. First, it contends that there was neither a request for, nor promise of, confidentiality in this case. Second, the State argues that other statements

made during the interrogation, "as well as [appellant's] demeanor during the confession . . . all demonstrate that [appellant] had no reasonable expectation that his statements would not be used against him[.]" Third, the State contends that the record supports the trial court's finding that the detective's statement "did not change [appellant's] willingness to answer questions in any way."

In Maryland, the confession of a criminal defendant will not be admitted as evidence at trial unless it was "(1) voluntary under Maryland nonconstitutional law, (2) voluntary under the Due Process Clause of the Fourteenth Amendment of the United States Constitution and Article 22 of the Maryland Declaration of Rights, and (3) elicited in conformance with the mandates of *Miranda*." *Griner v. State*, 168 Md. App. 714, 730, 899 A.2d 189 (2006) (citations omitted). *Accord Tolbert*, 381 Md. at 557, 850 A.2d 1192 (prosecutor must establish "by a preponderance of the evidence that the statement satisfies the mandates of *Miranda v. Arizona*, and, that the statement is voluntary.") (citing *Winder v. State*, 362 Md. 275, 305–06, 765 A.2d 97 (2001)). As explained below, we agree with the State that the circuit court properly rejected the argument that Detective Schrott's statement violated *Miranda* or rendered appellant's confession involuntary.

### A.

### *Miranda*

It is well-established that, before police officers may subject an individual to custodial interrogation, the individual must be advised of certain rights, including that "anything he says can be used against him in a court of law. . . ." *Miranda*, 384 U.S. at 479, 86 S.Ct. 1602. This requirement has been determined to be of constitutional dimension. *Dickerson v. United States*, 530 U.S. 428, 439–40, 120 S.Ct. 2326, 147 L.Ed.2d 405 (2000).

The United States Supreme Court has set forth a two-step process to determine whether a suspect has made a

voluntary, knowing, and intelligent waiver of his or her *Miranda* rights:

First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it. Only if the "totality of the circumstances surrounding the interrogation" reveals both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived.

*Moran v. Burbine,* 475 U.S. 412, 421, 106 S.Ct. 1135, 89 L.Ed.2d 410 (1986) (citation omitted). The determination whether an accused knowingly and voluntarily waived his right to remain silent is determined by reviewing the "totality of the circumstances surrounding the interrogation." *McIntyre v. State,* 309 Md. 607, 615, 526 A.2d 30(1987).

Here, there is no question that appellant was advised of his *Miranda* rights and that his initial waiver of these rights was valid. Rather, appellant's argument is that following this waiver, "[t]he deception employed by the detective vitiated [his *Miranda* ] rights and nullified his waiver."

■ The Court of Appeals has stated that the police "are permitted to use a certain amount of subterfuge, when questioning an individual about his or her suspected involvement in a crime." *Ball v. State,* 347 Md. 156, 178, 699 A.2d 1170 (1997), *cert. denied,* 522 U.S. 1082, 118 S.Ct. 866, 139 L.Ed.2d 763 (1998). They "are not permitted to employ coercive tactics in order to compel an individual to confess, but they are permitted to 'trick' the suspect into making an inculpatory statement." *Id.* at 179, 699 A.2d 1170.

Nevertheless, although "the use of trickery to encourage a suspect to confess is not inherently unlawful," *Whittington v. State,* 147 Md.App. 496, 520, 809 A.2d 721 (2002), *cert. denied,* 373 Md. 408, 818 A.2d 1107, *cert. denied,* 540 U.S. 851, 124 S.Ct. 136, 157 L.Ed.2d 92 (2003), there are limits on permissi-

ble police deception. Trickery or deception that interferes with a suspect's understanding of his or her *Miranda* rights is prohibited. *Logan v. State*, 164 Md.App. 1, 41, 882 A.2d 330 (2005) ("in contrast to traditional voluntariness, 'there is an absolute prohibition upon any trickery which misleads the suspect as to the existence or dimensions of any of the applicable [*Miranda*] rights ....'") (quoting 2 WAYNE R. LAFAVE, JEROLD H. ISRAEL AND NANCY J. KING, CRIMINAL PROCEDURE § 6.9(c) (3d. ed. 2000)), *aff'd*, 394 Md. 378, 906 A.2d 374 (2006).[8]

In *Logan*, this Court found a *Miranda* violation when a detective made "affirmative misstatements that conflicted with the *Miranda* advisement that anything appellant said could be used against him." 164 Md.App. at 48, 882 A.2d 330. The detective made various statements to Logan prior to Logan's waiver of rights, including: "we're talking"; "the only way this jeopardizes you is if you don't tell the truth"; and that the officer would not "use any of the information to harm" Logan. *Id.* This Court held that, in light of these statements, the *Miranda* advisement was "fatally flawed." *Id.* at 49, 882 A.2d 330. In particular, we held that the officer's statement, that the only way this jeopardizes you is if you don't tell the truth, "flatly contradicted the *Miranda* warning, and thus nullified" the *Miranda* warning given to Logan. *Id.* at 48, 882 A.2d 330.

We note that in *Logan* the improper statements were made *before* the suspect waived his *Miranda* rights. Here, by contrast, the statements at issue were made *after* Lee was advised of his rights and waived them. Some courts have indicated that misstatements or deception by police after a valid waiver does not invalidate the prior waiver. *See United States v. Bezanson–Perkins*, 390 F.3d 34, 41 (1st Cir.2004)

---

8. The Court of Appeals agreed with this Court that Logan's confession was taken in violation of *Miranda*, but it reversed this Court's conclusion that the error was harmless. *State v. Logan*, 394 Md. 378, 388–90, 906 A.2d 374 (2006). Nevertheless, because this Court had reversed Logan's conviction based on a finding of error regarding voir dire, *Logan*, 164 Md.App. at 69, 882 A.2d 330, the Court of Appeals affirmed this Court's decision. 394 Md. at 401, 906 A.2d 374.

(questioning whether police misstatements *after* a voluntary waiver could invalidate the waiver); *United States v. Chadwick*, 999 F.2d 1282, 1286 (8th Cir.1993) (detective's statement that Chadwick's cooperation would "help" him did not invalidate Chadwick's waiver of *his Miranda* rights; it "could not have had any impact on Chadwick's decision to waive his *Miranda* rights, since the waiver had occurred earlier."). *See also Soffar v. Cockrell*, 300 F.3d 588, 598 (5th Cir.2002) (detective's misleading statements to the defendant did not invalidate a *Miranda* waiver that had already occurred).

Other courts, however, have made no distinction with respect to the timing of police deception, and they have held that police deception after a waiver can nullify or vitiate the earlier *Miranda* warnings. *See, e.g., State v. Pillar*, 359 N.J.Super. 249, 820 A.2d 1, 10–11 (App.Div.) (agreement to suspect's request to speak "off the record" rendered subsequent statement inadmissible because "such a misrepresentation directly contradicts and thereby neutralizes the entire purpose of the Miranda warnings"), *cert. denied*, 177 N.J. 572, 832 A.2d 322 (2003); *State v. Stanga*, 617 N.W.2d 486, 491 (S.D.2000) (statements made after waiver "nullified" the earlier *Miranda* warnings). Courts adopting this approach view a suspect's waiver as a "*continuing* decision, implicit throughout the interrogation." ANDREW V. JEZIC, FRANK MOLONY, & WILLIAM E. NOLAN, MARYLAND LAW ON CONFESSIONS § 11:10, at 444 (2008). Thus, even if an initial waiver of *Miranda* was valid, subsequent deception by the police may "invalidate[ ] an essential term of the *Miranda* warnings, thereby rendering that waiver no longer in effect." *Id.*

■■ We agree that the timing of the police deception is not dispositive. Rather, the central issue is whether the deception misleads the suspect regarding the rights explained in the *Miranda* warnings and deprives the suspect "of knowledge essential to his ability to understand the nature of his rights and the consequences of abandoning them." *Moran*, 475 U.S. at 424, 106 S.Ct. 1135. If a voluntary decision to speak is "made with full awareness and comprehension of all

the information *Miranda* requires the police to convey," a waiver is valid. *Id.*

Against this background, we consider appellant's claim that a police officer's promise of confidentiality is the type of deception that nullifies an earlier *Miranda* warning. Prior to the *Miranda* decision, the Court of Appeals found that promises of confidentiality were not improper. *In Markley v. State*, 173 Md. 309, 316–18, 196 A. 95 (1938), the Court of Appeals rejected the argument that it is improper for the police to promise to keep the suspect's name "out of any published statements" and to regard his statement as "confidential." The Court stated that "[a]n assurance of secrecy is regularly held insufficient to render a confession inadmissible on the ground that it is involuntary...." *Id.* at 317, 196 A. 95. As indicated, however, this case pre dates the *Miranda* decision. Thus, it does not address the issue here, *i.e.,* whether a promise of confidentiality nullifies the requisite *Miranda* warnings.

Courts in other jurisdictions have held that a police officer's express promise of confidentiality contradicts the *Miranda* warning that "anything [a suspect] says can be used against [the suspect] in a court of law," 384 U.S. at 479, 86 S.Ct. 1602, and, therefore, it nullifies the warning. In *Spence v. State*, 281 Ga. 697, 642 S.E.2d 856, 857 (2007), the defendant waived his *Miranda* rights and was interrogated about a murder. After the defendant "broke down in tears," the officer said "just you and me," and told the defendant "[t]his is confidential what we're doing right here. Do you understand that? This is confidential...." *Id.* The suspect subsequently gave a statement implicating himself in the murder. *Id.* The Supreme Court of Georgia held that the statement was inadmissible. *Id.* at 858. The court relied on the rationale of *Hopkins v. Cockrell*, 325 F.3d 579, 585 (5th Cir.), *cert. denied*, 540 U.S. 968, 124 S.Ct. 430, 157 L.Ed.2d 314 (2003), in which the Fifth Circuit held that the police cannot make statements inconsistent with the *Miranda* warnings and then use the confession against the defendant. *Spence*, 642 S.E.2d at 858.

In *Hopkins,* the investigating officer told the defendant that "their conversation was confidential," stating "[t]his is for me and you. This is for me. Okay. This ain't for nobody else." 325 F.3d at 584. The Fifth Circuit held that these statements "passed the line into the sort of lying that deprives a defendant 'of the knowledge essential to his ability to understand the nature of his rights and the consequences of abandoning them.' " *Id.* (quoting *Moran,* 475 U.S. at 424, 106 S.Ct. 1135.).

Similarly, in *Pillar,* 820 A.2d at 8, following administration of *Miranda* warnings, the defendant asked to "say something 'off-the-record.' " The police agreed to listen to an "off-the-record" statement, and the defendant made an incriminating admission. *Id.* In concluding that the statement should have been suppressed, the Superior Court of New Jersey reasoned:

A police officer cannot directly contradict, out of one side of his mouth, the *Miranda* warnings just given out of the other. An acquiescence to hear an "off-the-record" statement from a suspect, which the officer ought to know cannot be "off-the-record," totally undermines and eviscerates the *Miranda* warnings, at least with respect to a statement made, as here, in immediate and direct response to the misleading assurance.

*Id.* at 11–12.

We agree that an express promise of confidentiality is inconsistent with the *Miranda* warning that "anything [a suspect] says can be used against [the suspect] in a court of law." *Miranda,* 384 U.S. at 479, 86 S.Ct. 1602. When a police officer makes such a promise of confidentiality, it can nullify the *Miranda* warning. If the totality of the circumstances shows that the suspect was led to believe that his or her statement would not go beyond the interrogation room, a subsequent statement is not given in compliance with the requirements of *Miranda.*

Turning to the facts of the present case, we must determine, under the totality of the circumstances, whether Detective Schrott's statement amounted to a promise of confidentiality. A promise is "[t]he manifestation of an intention to

act or refrain from acting in a specified manner, conveyed in such a way that another is justified in understanding that a commitment has been made; a person's assurance that the person will or will not do something." BLACK'S LAW DICTIONARY 1249 (8th ed. 2004).

Here, unlike the cases cited, *supra*, there was no express promise that the defendant's statements would remain confidential or that the statements were "off-the-record." Detective Schrott merely responded to appellant's query regarding whether the interrogation was being recorded by stating: "This is between you and me, bud. Only me and you are here, all right? All right?" As the State notes, this statement did not reflect any agreement of confidentiality. Rather, it was an equivocal response that was designed, not to establish a confidential relationship, but to deflect appellant's suggestion that he was aware that the interrogation was being recorded. We view Detective Schrott's response as sidestepping appellant's question regarding whether the interrogation was being recorded.

 Even if the response is viewed as an affirmative misstatement that the interrogation was not being recorded, however, such a response would not violate *Miranda*. "There is no requirement that a defendant who has properly been given *Miranda* warnings must also be told he . . . may be tape-recorded or video-recorded or both." *State v. Vandever*, 314 N.J.Super. 124, 714 A.2d 326, 328 (App.Div.1998), *cert. denied*, 178 N.J. 32, 834 A.2d 405 (2003). Police deception regarding whether an interrogation is being recorded, does not contradict the *Miranda* warning that anything the suspect says can be used against the suspect. A police officer's false statement that an interrogation is not being recorded, when in fact it is being recorded, does not render a confession inadmissible. *State v. Wilson*, 755 S.W.2d 707 (Mo.Ct.App.1988).[9]

---

9. In *Wilson*, the defendant did not argue that subterfuge in the form of a false statement regarding whether the interrogation was being recorded violated *Miranda*. Rather, Wilson argued that this trickery rendered his confession involuntary, a contention that the Missouri Court of

Perhaps recognizing that deception regarding whether an interrogation is being recorded does not violate *Miranda,* appellant's argument is couched solely on the assertion that Detective Schrott's statement was a promise of confidentiality. As indicated, however, unlike the cases cited, *supra,* the detective did not make an express promise of confidentiality, and he did not contradict the *Miranda* warnings.

Appellant cites to one case that merits further discussion. *State v. Stanga,* 617 N.W.2d at 486, involved statements similar to the statement in this case. The facts in that case, however, were materially different.

In *Stanga,* the police arrested Stanga and advised him of his *Miranda* rights. *Id.* at 487–88. Based on Stanga's "slurred speech" and the smell of alcohol on his breath, the police concluded that Stanga was "under the influence." *Id.* at 488. The court summarized the interrogation as follows:

> [Detective] Lubbers said numerous times that he was there to listen, making comments such as "it's between you and me," "I'm here to listen to your side," and "you need to get this off your chest," all as part of his interrogation technique. Stanga said repeatedly that he went to the house to "talk" to Judy, but he also admitted hitting her, and then divulged having in mind a plan to kill her. Throughout the interview, he sought assurances on whether he could trust the detective-whether he could speak "straight up." When Stanga seemed to forget who he was talking to, Lubbers reminded him, "Well, I am the cop." At one point, Stanga told the detective, "I know you're here to get something against me." But Lubbers responded, "No, I'm here for you and I to talk." After hearing this, Stanga said, "Okay. I'm going to tell you straight up, and if it goes any further

Appeals rejected. *State v. Wilson,* 755 S.W.2d 707, 709 (Mo.Ct.App. 1988). *Accord Blake v. State,* 972 So.2d 839, 845 (Fla.2007) (implied promise not to record statement not coercive police action that rendered videotaped confession involuntary), *cert. denied,* —— U.S. ——, 128 S.Ct. 2442, 171 L.Ed.2d 242 (2008).

than me and you, then I won't tell. I don't know." Lubbers responded, "You can trust me straight up. Go ahead." Still needing more assurance, Stanga asked, "What I say to you, suppose it goes to everybody?" As the videotape ran and as other officers watched unseen, Lubbers replied, "Between you and me. There's nobody else in the room here. It's between you and me." Stanga confided again that he was thinking about killing Judy when he broke into her home. Later, seeming to understand that his statement could be used against him, Stanga said, "I'll tell you the truth and you tell the judge." Yet at the end of the interview, Stanga repeated his earlier overture, "Don't tell anybody either." Lubbers responded, "No, I ain't telling anybody anything . . . ."

*Id.* at 489.

The Supreme Court of South Dakota held that some of the police officer's assurances "clearly crossed the line" and "nullified" the earlier *Miranda* warnings. *Id.* at 490. The court stressed that the officer "repeatedly contradict[ed] the admonition that anything Stanga said could be used against him," noting that the officer "told Stanga **twelve times** that what was said during the interrogation was between the two of them." *Id.* at 490 (emphasis added). The court stated that the *Miranda* warnings "would be senseless if interrogating officers can deceive suspects into believing their admissions will not go beyond the interrogation room." *Id.* at 491.

The facts in *Stanga* are materially different from the facts here. In *Stanga*, the suspect was intoxicated, the officer stated 12 times that any statements made were between the two of them, and the defendant sought assurances from the detective that his statements would remain confidential. *Id.* at 488, 490. It was in this context that the court held that the officer "crossed the line" and "nullified" the earlier *Miranda* warnings. *Id.* at 490–91.

Here, by contrast, Detective Schrott did not deceive appellant into believing that his admissions would "not go beyond the interrogation room." *Id.* at 491. Detective Schrott made

one statement that the conversation was between the two of them. The statement was not made in response to a request for confidentiality, but rather, it was in response to a question whether the interrogation was being recorded. In context, the statement was not a promise of confidentiality.

Moreover, a review of the entire interrogation makes clear that neither appellant nor Detective Schrott believed that the statements appellant made were confidential. Detective Schrott, in suggesting why appellant would want to give a statement, appealed to appellant's concern about how others might view the murder, stating "you don't want to be seen as coldblooded" and "[i]t's for [the victim's] family to know [what happened] too." Detective Schrott subsequently advised appellant that he would speak to the prosecutor and inform the prosecutor that appellant was cooperative and that he "gave [the police] the straight story." Although the Detective's second statement occurred after appellant gave his confession, it supports our finding that, unlike the cases to which appellant cites, neither appellant nor the detective believed that the statements made during the interrogation would remain confidential.

We note that officers should use caution in making statements such as those made here because they subsequently could be construed as vitiating the *Miranda* warnings. Here, however, in the context in which the words were spoken, the officer did not cross the line. Unlike the above cases, the officer did not promise confidentiality or suggest that appellant's statements would not go beyond the interrogation room. We find no *Miranda* violation in this case.

## B.

### Voluntariness of the Confession

Appellant next argues that Detective Schrott's statement, that "[t]his is between you and me, bud," rendered his subsequent confession involuntary. In Maryland, a confession is not admissible if it was not made freely and voluntarily. *Tolbert*, 381 Md. at 558, 850 A.2d 1192.

Appellant's argument that his confession was not voluntary rests solely on his assertion that Detective Schrott's statement constituted a promise of confidentiality. In support of his argument, he cites cases from other jurisdictions, which hold that a promise of confidentiality renders a subsequent statement involuntary. *See Jones v. State,* 65 P.3d 903, 905 (Alaska Ct.App.2003) (law enforcement advised that a suspect's statement was "[o]ff the record"); *State v. McDermott,* 131 N.H. 495, 554 A.2d 1302, 1304 (1989) (federal agent promised that statement "would not leave the office").

For the reasons discussed, *supra,* we have found that there was no promise of confidentiality in this case. The cases cited by appellant, therefore, are inapposite, and appellant's argument is unavailing. The circuit court properly denied appellant's motion to suppress his statement to the police.

## II.

### Failure to Instruct Jury

Appellant's second contention of error is that the circuit court deprived him "of a fundamentally fair trial" when it instructed the jury on first-degree felony murder, but it refused to give his requested jury instruction on second-degree murder and involuntary manslaughter. In his initial brief, appellant supports his argument by quoting extensively from *Hook v. State,* 315 Md. 25, 553 A.2d 233 (1989), which addressed the refusal of a court to give a lesser included offense instruction.

The State counters that the circuit court properly declined appellant's request for two reasons: (1) second-degree murder and involuntary manslaughter are not lesser included offenses of felony murder; and (2) no rational jury could have found appellant guilty of second-degree murder or involuntary manslaughter without also finding him guilty of felony murder.

In *Hook,* the Court of Appeals discussed a defendant's right to have the jury instructed regarding a lesser included offense. In that case, similar to this case, the State charged the

defendant with murder pursuant to the shortened statutory form indictment. *Id.* at 32, 553 A.2d 233.[10] Pursuant to this form of indictment, even though the language used refers to first-degree murder, a defendant may be convicted of first-degree murder, second-degree murder, or manslaughter. *Id.* at 32 n. 11, 553 A.2d 233. A conviction of murder in the first-degree may be on the basis of premeditated murder or felony murder. *Id.*

In *Hook*, at trial, the State entered a nol pros, over defense counsel's objection, to the second-degree murder charge. *Id.* at 35, 553 A.2d 233. Defense counsel requested permission to argue second-degree murder to the jury, but "[t]he court refused to instruct the jury as to second degree murder and refused to permit defense counsel to argue to the jury the issue of second degree murder." *Id.* at 37, 553 A.2d 233. The jury convicted the defendant of murder in the first-degree based on both premeditated murder and felony murder. *Id.* at 38, 553 A.2d 233.

The Court of Appeals reversed Hook's conviction. Although recognizing the broad discretion of a prosecutor regarding whether to nol pros a count, "or even part of a count," *id.* at 35, 553 A.2d 233, the Court noted that the prosecutor's discretion "may be fettered in the proper circumstances." *Id.* at 37, 553 A.2d 233. The Court held:

> When the defendant is plainly guilty of some offense, and the evidence is legally sufficient for the trier of fact to convict him of either the greater offense or a lesser included offense, it is fundamentally unfair under Maryland common law for the State, over the defendant's objection, to *nol pros* the lesser included offense. . . . In short, it is simply offensive to fundamental fairness, in such circumstances, to deprive the trier of fact, over the defendant's objection, of

---

**10.** Maryland Code (2002), § 2–208 of the Criminal Law Article, formerly Art. 27 § 616, provides that an indictment for murder is sufficient if it substantively states: "(name of defendant) on (date) in (county) feloniously (willfully and with deliberately premeditated malice) killed (and murdered) (name of victim) against the peace, government, and dignity of the State."

the third option of convicting the defendant of a lesser included offense. And if the trial is before a jury, the defendant is entitled, if he so desires, to have the jury instructed as to the lesser included offense.

*Id.* at 43–44, 553 A.2d 233.

Although appellant's initial brief relied heavily on the *Hook* analysis that a defendant is entitled to have lesser included offenses submitted to the jury, in appellant's reply brief and during oral argument, counsel for appellant stated that she was not arguing that second-degree murder and involuntary manslaughter were lesser included offenses. Rather, she argued that, because the State charged appellant in Count I under the "short-form" indictment, second-degree murder and involuntary manslaughter were charged offenses on which appellant was entitled to an instruction.[11]

This argument misconstrues the scope of the *Hook* decision. In *Hook,* the Court of Appeals made clear that, if the State properly enters a nolle prosequi with respect to some of the charges included in a short form indictment, those offenses are no longer in the case. 315 Md. at 41, 553 A.2d 233 (court's refusal to give the requested instruction on second-degree murder stemmed from State's nol pros of second-degree murder, leaving no charge of second-degree murder on which the jury could convict).

Here, the prosecutor nol prossed the charges of second-degree murder and involuntary manslaughter. When appellant moved for judgment of acquittal at the close of the State's case on the charge of first-degree premeditated murder, the court noted that the verdict sheet submitted by the prosecutor

---

11. Count I of the Indictment stated:

The Jurors of the State of Maryland, for the body of Baltimore County, do on their oath present that CHRISTIAN DARRELL LEE, on or about 9/8/2006, in Baltimore County, did feloniously, willfully and of deliberately premeditated malice aforethought kill and murder one Eric Fountain; against the peace, government and dignity of the State. (Murder, Criminal Law Article 2–201, 2 0900)

"says only felony murder of Eric Fountain." The following exchange then occurred:

[PROSECUTOR]: That is the instruction we have submitted. We are not arguing premeditated [murder] of Eric Fountain.

[THE COURT]: **So it only says felony murder. That's all that's being submitted.**

[DEFENSE COUNSEL]: Yes, ma'am.

[THE COURT]: Which is first-degree murder.

[DEFENSE COUNSEL]: Yes, ma'am. **I just wanted to make sure that we're not talking about any others.**

Other than that, I would just suggest the State has failed to prove a prima facie case as to the charge of felony murder, and not ask to be heard any further.

(Emphasis added).

By submitting only the charge of first-degree felony murder to the jury, the prosecutor effectively nol prossed the charges of first-degree premeditated murder, second-degree murder, and manslaughter. *See Jackson v. State,* 322 Md. 117, 123, 124 n. 3, 586 A.2d 6 (1991) (prosecutor's submission of only three counts to the jury constituted a nol pros of the other two counts, regardless of how the prosecutor characterized her actions); *Dean v. State,* 325 Md. 230, 234, 600 A.2d 409 (1992) (a nolle prosequi " 'need not be couched in any particular language or take any specific form; it is the substance of the prosecution's action which controls' ") (quoting *Hooper v. State,* 293 Md. 162, 168, 443 A.2d 86 (1982)). In light of the nol pros, to which there was no objection, second-degree murder and involuntary manslaughter were not before the jury. Accordingly, the court was not required to instruct the jury on those offenses under Maryland Rule 4–325(c).[12] *See Dean,* 325 Md. at 240, 600 A.2d 409 (trial court did not abuse its discretion in refusing to instruct on a charge of assault with

---

**12.** Maryland Rule 4–325(c) provides, in pertinent part: "[T]he court may, and at the request of any party shall, instruct the jury as to the applicable law . . . ."

intent to disfigure because State nol prossed charge and it "was not before the court.").

The issue in *Hook* was whether the court should have allowed the prosecutor, over objection, to nol pros the charge of second-degree murder. The question was whether it violated fundamental fairness to nol pros second-degree murder, which was a lesser included offense of the charge submitted to the jury, first-degree premeditated murder. 315 Md. at 41, 553 A.2d 233.

Here, unlike in *Hook*, the prosecutor nol prossed the charge of first-degree premeditated murder, in addition to the charges of second-degree murder and involuntary manslaughter. The only charge submitted to the jury in Count I was first-degree felony murder. Thus, pursuant to *Hook*, fundamental fairness required instructions on second-degree murder and involuntary manslaughter only if they are lesser included offenses of first-degree felony murder. This Court has consistently rejected such an assertion. *See Malik v. State*, 152 Md.App. 305, 331, 831 A.2d 1101 (2003). ("[S]econd degree murder is not a lesser included offense of first degree felony murder."), *cert. denied*, 378 Md. 618, 837 A.2d 929 (2003); *Sutton v. State*, 139 Md.App. 412, 458, 776 A.2d 47 ("It is clear that neither second degree murder nor manslaughter is a lesser included offense of felony murder."), *cert. denied*, 366 Md. 249, 783 A.2d 223 (2001); *West v. State*, 124 Md.App. 147, 161, 720 A.2d 1253 (1998) ("[T]he jury was not required to be instructed on second-degree murder because it is not a lesser included offense of first-degree felony murder . . . ."), *cert. denied*, 353 Md. 270, 725 A.2d 1068 (1999). *Accord* JUDGE CHARLES E. MOYLAN, JR., CRIMINAL HOMICIDE LAW § 5.2, at 115 (2002) ("The law is clear that where one of the statutorily designed felonies (or their attempts) spelled out in [the first-degree felony murder statute] is involved, the verdict must be first-degree murder or nothing. **There is no lesser included second-degree form or manslaughter form of the crime involved and no instruction on such lesser offenses should be given.**") (emphasis added) (footnotes omitted).

Because the State nol prossed the charges of second-degree murder and involuntary manslaughter, and because they are not lesser included offenses of first-degree felony murder, appellant was not entitled to an instruction on these offenses. The trial court properly denied appellant's request.

## III.

### Supplemental Jury Instruction

 During its deliberations, the jury submitted a note with the following question:

1. In the case of felony murder anyone present is as guilty as the person who personally commits the murder.

2. In the case of felony robbery does the same hold true?

Both the prosecutor and defense counsel initially agreed with the court's suggestion to answer the question by referring the jury to the previous jury instructions given.[13] Defense counsel, however, subsequently expressed concern that the first sentence in the jury note was not accurate. After hearing argument from both the State and defense counsel regarding the proper response, the court responded to the jury's question as it initially suggested: "The answer to this question is contained in the Jury Instructions provided to you." [14]

Appellant contends that the circuit court erred in its response to the jury's question. He argues that the jury note

---

**13.** The court had provided the jury with a written copy of the jury instructions for its review during deliberations.

**14.** Defense counsel wanted the court to advise the jury that "the first sentence is not correct, and the jury should review the instruction regarding aiding and abetting and the instruction regarding felony murder." The State objected to instructing the jury that the first sentence was incorrect "because we don't know exactly what they're thinking back there in terms of presence." The State requested that the court refer the jury to the previous instructions on aiding and abetting and the elements of the substantive offenses. Defense counsel objected to directing the jury to any particular instruction if the court did not instruct that the first sentence in the note was incorrect. It was at that point that the court decided merely to respond that the answer to the jury's question was contained in the jury instructions provided to them.

"evinced the jury's misunderstanding of the law," and the court "failed in its duty" to clarify the confusion and "give the jury the required guidance."

The State argues that the court properly exercised its discretion in responding to the jury note. It argues that it is not clear "whether the jury's language was the result of actual confusion or a simple error in paraphrasing," or, if there was confusion, "the extent or source of that confusion." The State argues:

> Rather than craft a response that speculated as to the source and extent of confusion—confusion that may or may not have existed—the trial judge instead opted to instruct the jury to review the previously provided jury instructions. Because such language was clearly designed to avoid any further confusion that may have resulted from a response based in speculation, the trial judge did not abuse her discretion.

Moreover, the State asserts that "it is clear that the language in the instructions previously provided [to the jury] adequately addressed any possible questions that were evidenced by the jury's note," and, therefore, "the trial judge's admonishment to the jury to review the instructions already provided was within her proper discretion."

Maryland Rule 4–325(a) provides that "[t]he court shall give instructions to the jury at the conclusion of all the evidence and before closing arguments and may supplement them at a later time when appropriate." "Trial courts have discretion in deciding whether to give a jury supplemental instructions in a criminal cause." *Cruz v. State*, 407 Md. 202, 210, 963 A.2d 1184 (2009). The court's decision to give supplemental instructions "will not be disturbed on appeal, absent a clear abuse of discretion." *Roary v. State*, 385 Md. 217, 237, 867 A.2d 1095 (2005).

There is no dispute in this case that the court properly exercised its discretion in giving a supplemental jury instruction. The question here involves the propriety of the court's response to the jury's question.

The Court of Appeals has made clear that, when a jury asks a question that reflects confusion on an issue, the trial judge "must respond" to the question "in a way that clarifies the confusion" if "the question involves an issue central to the case." *State v. Baby,* 404 Md. 220, 263, 946 A.2d 463 (2008) (citing *Lovell v. State,* 347 Md. 623, 658–59, 702 A.2d 261 (1997)). In *Baby,* the defendant was charged with first-degree rape. *Id.* at 223, 946 A.2d 463. The trial judge instructed the jury on the elements of the offense, including that "[r]ape is unlawful vaginal intercourse with a female by force or threat of force and without her consent." *Id.* at 262, 946 A.2d 463. During deliberations, the jury sent a note asking: "If a female consents to sex initially and, during the course of the sex act to which she consented, for whatever reason, she changes her mind and the man continues until climax, does the result constitute rape?" *Id.* The court responded that it was "unable to answer this question as posed. Please reread the instructions as to each element and apply the law to the facts as you find them." *Id.* The next day, the jury sent another note, asking: "If at any time the woman says stop is that rape?" *Id.* The judge again referred the jury to its instruction giving "the legal definition of rape which includes the definition of consent." *Id.*

The Court of Appeals held that the judge's response, referring the jury to the previous instruction on the elements of rape, was not sufficient to address either of the jury's questions. *Id.* at 263–64, 946 A.2d 463. The Court did not hold that it was never sufficient to answer a jury's question by referring to the prior instructions. Rather, the Court held that the response was not sufficient in that case because the initial instructions given did not answer the jury's question: "[T]he definition makes no reference to the issue of post-penetration withdrawal of consent which was central to the jury's questions." *Id.* at 263–64, 946 A.2d 463.

Here, in contrast to *Baby,* the court's response to the jury, that the answer to the jury's question was contained in the jury instructions already provided, did address the jury's question. The instructions previously given, and which had

been provided to the jury in writing, made clear that an individual's mere presence while a crime is committed is insufficient to support a conviction for felony murder.

The instruction regarding the significance of appellant's presence at the crime scene was as follows:

> **A person's presence at the scene of a crime, without more, is not enough to prove that the person committed a crime.** The fact that a person witnessed a crime, made no objection or did not notify the police does not make that person guilty of a crime. However, a person's presence at the time and place of the crime is a fact in determining whether the defendant is guilty or not guilty.

(Emphasis added).

With respect to the felony murder count, the court instructed the jury that, in order to convict the appellant of felony murder, the State must prove that appellant participated in the underlying robbery or burglary:

> To convict the defendant of first-degree felony murder, the State must prove that the defendant or another participating in the crime with the defendant committed a robbery and/or first-degree burglary, that the defendant killed Eric Fountain, and that the act resulting in the death of Eric Fountain occurred during the commission of the robbery and/or first-degree burglary.

With respect to aiding and abetting, the court instructed the jury that aiding and abetting required the following:

> A person who aids and abets in the commission of a crime is as guilty as the actual perpetrator even though he did not personally commit each of the acts that constitutes the crime.

> **A person who aids and abets in the commission of a crime by knowingly associating with the criminal venture with the intent to help commit the crime, being present when the crime is committed, and seeking by some act to make the crime succeed.**

In order to prove that the defendant aided and abetted the commission of a crime, the State must prove that the defendant was present when the crime was committed **and that the defendant willfully participated with the intent to make the crime succeed.**

(Emphasis added).

Thus, to the extent that the jury was confused about the requirements for a conviction, the court's response that the jury should refer to the court's earlier instructions was a proper response, and it was sufficient to address the jury's question. The initial instructions clearly indicated that appellant's presence alone was insufficient to support a conviction. We find no error in the court's supplemental instruction to the jury.

## IV.

### Motion for Joinder

▮▮▮ Appellant's final contention is that the circuit court erred in granting the State's motion to join for trial the charges involving the solicitation of the murder of Chelene with the charges involving the Fountain residence. Appellant argues that "the lack of mutual admissibility required separate trials" because evidence that appellant was detained in the Baltimore County Detention Center, where "he purportedly solicited another inmate to murder Chelene, was irrelevant to the murder case and highly prejudicial." He further contends that, even if evidence of the murder was admissible to show motive for the charge of solicitation of murder, admission of the details of the murder was "extremely prejudicial" with respect to the solicitation charge.

The State counters that appellant is not entitled to a new trial on this ground for three reasons. First, it argues, appellant failed to preserve this issue for appellate review. Second, even if preserved, the State argues that the circuit court properly joined the two cases for trial because the evidence was mutually admissible. Third, the State disputes

appellant's claim that evidence relating to each offense was highly prejudicial to trial on the other offenses.

Initially, we conclude that appellant failed to preserve this issue for our review. Appellant did not make the same argument below that he raises on appeal.

In arguing against joinder in the circuit court, appellant began by suggesting that the court defer ruling on the motion to join offenses until the State decided whether it was going to call Chelene as a witness: "Again, in light of the question whether Ms. Smith is even going to testify, I would suggest that that may be premature until that decision is made." The court rejected that suggestion. The following then occurred:

[DEFENSE COUNSEL]: Then I would suggest to the Court it would be inappropriate to join them because I'm concerned about testimony coming in that would be admissible in the one case but would only be admissible in that one. If they are joined I have to deal with it.

But, um, if she is unavailable I'm not sure what effect that is going to have on the State's ability to even proceed on the matter, and yet the testimony might already been in. So I'm just concerned about that confusion.

[PROSECUTOR]: Your Honor, it's the State's position whether Ms. Smith were to testify or not, the defendant's actions in soliciting her murder, because she is [a] witness in [this] case, is evidence of guilt. Whether she actually appears to testify or not, that doesn't—that doesn't matter in the terms of whether the cases should be joined. It is still, the one case is solicitation, it is evidence of the solicitation.

The other is, it's the murder she is a potential witness and it's evidence of guilt in terms of trying to eliminate that witness.

[DEFENSE COUNSEL]: Well, again, that makes certain assumptions that I would suggest the Court should not engage in.

For one thing, the assumption that is, let's assume he did solicit to have her come to some harm, that's an assumption, it is for that reason, not some other reason.

The prosecutor then proffered that the informant stated that appellant wanted Ms. Smith harmed "because there were only two people who could have ratted him out, one is her." Defense counsel clarified that the informant was the other person, and he advised the court that he had no further argument on the State's motion to join the offenses.

Appellant's argument below was based on a concern that Chelene might give testimony that was not admissible in both trials.[15] He did not argue, as he does on appeal, that "the lack of mutual admissibility required separate trials" or that the evidence relating to each offense was "highly prejudicial" in a trial on the other offenses. Under these circumstances, appellant has failed to preserve this issue for appeal. *See Jeffries v. State,* 113 Md.App. 322, 341, 688 A.2d 16 (" '[W]hen the grounds for an objection are stated by the objecting party, either on a volunteered basis or at the request of the court, only those specifically stated are preserved for appellate review; those not stated are deemed waived.' ") (quoting *Banks v. State,* 84 Md.App. 582, 588, 581 A.2d 439 (1990)), *cert. denied,* 345 Md. 457, 693 A.2d 355 (1997); *Harmony v. State,* 88 Md.App. 306, 317, 594 A.2d 1182 (1991) (" 'To preserve an issue for appellate review, it must first have been *presented, with particularity,* to the trial court.' ") (quoting *Jordan v. State,* 82 Md.App. 225, 244, 571 A.2d 238 (1990)).

Even if this contention was preserved, we would find it to be without merit. Maryland Rule 4–253 "governs joinder of separate cases for trial." *McGrier v. State,* 125 Md.App. 759, 764, 726 A.2d 894, *cert. denied,* 355 Md. 613, 735 A.2d 1107 (1999). The Rule provides, in pertinent part, as follows:

(b) **Joint trial of offenses.** If a defendant has been charged in two or more charging documents, either party may move for a joint trial of the charges. In ruling on the

---

**15.** Chelene ultimately did not testify at trial.

motion, the court may inquire into the ability of either party to proceed at a joint trial.

(c) **Prejudicial joinder.** If it appears that any party will be prejudiced by the joinder for trial of counts, charging documents, or defendants, the court may, on its own initiative or on motion of any party, order separate trials of counts, charging documents, or defendants, or grant any other relief as justice requires.

Md. Rule 4–253(b)(c).

Joinder of offenses "has been justified on the basis that 'a single trial effects an economy, by saving time and money, to the prosecution, the defendant, and the criminal justice system.'" *Conyers v. State,* 345 Md. 525, 548, 693 A.2d 781 (1997) (quoting *McKnight v. State,* 280 Md. 604, 608–09, 375 A.2d 551 (1977)). "There is a risk, however, that joinder of offenses may be prejudicial to the defendant." *Id.*

In determining whether joinder of offenses is permissible, a court first must determine whether the evidence as to each crime would be mutually admissible at separate trials. In a jury trial, severance is "absolutely mandated, as a matter of law, when the evidence with respect to the separate charges ... would not be mutually admissible." *Solomon v. State,* 101 Md.App. 331, 340, 646 A.2d 1064 (1994), *cert. denied,* 337 Md. 90, 651 A.2d 855 (1995). In determining "mutual admissibility," a judge "has to look to the circumstances under which evidence of 'other crimes' would be admitted in the trial of a single defendant on a single charge." *Id.* at 342, 646 A.2d 1064. *Accord Bussie v. State,* 115 Md.App. 324, 333, 693 A.2d 49 (1997) (the doctrine of "mutual admissibility" concerns whether "evidence of each crime would be admissible in a trial for the other").

The Court of Appeals has set forth a two-part test with respect to the analysis of jury trial joinder issues:

(1) is evidence concerning the offense or defendants mutually admissible; and (2) does the interest in judicial economy outweigh any other arguments favoring severance? If the

answer to both questions is yes, then joinder of offenses or defendants is appropriate. In order to resolve question number one, a court must apply the first step of the "other crimes" analysis announced in *[State v.] Faulkner[*, 314 Md. 630, 552 A.2d 896 (1989)]. If question number one is answered in the negative, then there is no need to address question number two....

*Conyers,* 345 Md. at 553, 693 A.2d 781. *Accord Harper v. State,* 162 Md.App. 55, 88, 873 A.2d 395 (2005). If, however, the answer to step one is yes, and the evidence is mutually admissible, "the trial judge has discretion to join or sever the charges, and that decision will be disturbed only if an abuse of discretion is apparent." *Carter v. State,* 374 Md. 693, 705, 824 A.2d 123 (2003).

 With respect to the first step of the two-part test, the evidence here was mutually admissible. The Court of Appeals decision in *Conyers* is instructive in this regard. In *Conyers,* the appellant and Lawrence Bradshaw committed a burglary. 345 Md. at 534–35, 693 A.2d 781. After Conyers shot and killed Wanda Johnson, a resident of the house, Conyers became aware that Mr. Bradshaw had been identified as a participant in the crimes. *Id.* at 535–36, 693 A.2d 781. Conyers then shot and killed Mr. Bradshaw. *Id.* at 536, 693 A.2d 781.

Conyers argued that the trial court erred in joining for trial the charges regarding the murder of Ms. Johnson with the charges regarding the murder of Mr. Bradshaw. In rejecting that argument, the Court of Appeals stated:

> The judge determined that evidence concerning the Johnson murder would be admissible in a trial on the Bradshaw murder because it would be relevant to show motive. The Bradshaw murder was, according to the State's theory, committed to conceal the Johnson murder. This Court has repeatedly stated that motive is one of the "other purposes" that will overcome the presumption of exclusion that pertains to "other crimes" evidence.

Evidence concerning the Bradshaw murder, similarly, would be admissible in a trial on the Johnson murder. It would be relevant to show consciousness of guilt by showing that Appellant murdered the only witness to the Johnson killing. This Court has held that consciousness of guilt is an "other purpose" that will overcome the presumption of exclusion that is attached to "other crimes" evidence. Evidence of escape from confinement or of flight after a crime is the most common "other crimes" evidence that is offered to show consciousness of guilt. Other attempts to conceal involvement in criminal activity have also been held admissible to show a defendant's consciousness of guilt, however. Mr. Bradshaw was present at the scene of Ms. Johnson's murder and potentially could identify Appellant as Ms. Johnson's murderer. Evidence that Appellant was also responsible for Mr. Bradshaw's murder would be admissible as evidence of Appellant's consciousness of guilt and as an expression of his attempt to conceal his involvement in the murder of Ms. Johnson.

*Id.* at 554–55, 693 A.2d 781 (citations omitted).

That same analysis applies here. As in *Conyers,* evidence of the murder of Mr. Fountain was admissible with respect to the solicitation charge because it was relevant to show motive. Similarly, evidence relating to the offense of soliciting the murder of Chelene, one of "two people who could have ratted him out" on the murder, was admissible to show consciousness of guilt. *See United States v. Van Metre,* 150 F.3d 339, 352 (4th Cir.1998) (solicitation of inmate to murder witness who would testify in defendant's forthcoming kidnapping case was admissible to demonstrate consciousness of guilt); *Lovett v. State,* 516 A.2d 455, 468 (Del.1986) (evidence of the defendant's plan to kill a prospective witness against him on murder charges was relevant to the defendant's consciousness of guilt), *cert. denied,* 481 U.S. 1018, 107 S.Ct. 1898, 95 L.Ed.2d 504 (1987). Thus, the evidence here was mutually admissible.

We turn next to the second step of the two-part test regarding joinder, *i.e.,* "does the interest in judicial econo-

my outweigh any other arguments favoring severance?" *Conyers*, 345 Md. at 553, 693 A.2d 781. This determination is within the discretion of the trial judge, and it will not be disturbed absent an abuse of discretion. *Carter*, 374 Md. at 705, 824 A.2d 123.

Appellant contends that, even if evidence of the murder was admissible in a trial on the solicitation charge to show motive, the "details of the murder" would be "extremely prejudicial in a separate trial for the solicitation charge." Similarly, appellant argues that evidence that he was detained at the Baltimore County Detention Center when he solicited another inmate to murder Chelene was "highly prejudicial" to the murder case. We are not persuaded that the evidence was unduly prejudicial. We find no abuse of discretion in the court's order granting the State's motion for joinder of offenses.

**JUDGMENTS AFFIRMED. COSTS TO BE PAID BY APPELLANT.**