16 A.3d 283

Henry P. ANGULO–GIL

v.

STATE of Maryland.

No. 1204, Sept. Term, 2009.

Court of Special Appeals of Maryland.

March 31, 2011.

126

Martha Gillespie (Paul B. DeWolfe, Public Defender, on the brief), Baltimore, MD, for appellant.

Sarah Page Pritzlaff (Douglas F. Gansler, Atty. Gen., on the brief), Baltimore, MD, for appellee.

Panel: EYLER, DEBORAH S., MEREDITH, ARRIE W. DAVIS (Retired, Specially Assigned), JJ.

ARRIE W. DAVIS (Retired, Specially Assigned), J.

A grand jury in Prince George's County indicted Henry P. Angulo–Gil, appellant, for first-degree premeditated murder, use of a handgun in the commission of a crime of violence, conspiracy to commit robbery with a deadly weapon, carjacking and theft of property (an automobile) having a value greater than $500. On January 23, 2009, the circuit court held a hearing on appellant's motion to suppress statements made during custodial interrogation, and to sever the murder counts from the carjacking-related counts. The circuit court granted the motion to sever and ordered separate trials. The suppression motion was taken under advisement. On February 4, 2009, the circuit court denied the motion to suppress in a written opinion and order.

The first jury trial relating to the carjacking began on February 2, 2009. The circuit court granted appellant's motion for judgment of acquittal on the charge of carjacking, but denied the motion as to theft of an automobile. The jury found appellant guilty of theft of an automobile having a value of more than $500.

The second jury trial relating to the murder charges began on February 9, 2009 and concluded on February 12, 2009. The jury found appellant not guilty of first-degree murder, not guilty of second-degree murder, guilty of involuntary manslaughter, guilty of first-degree felony murder, guilty of second-degree felony murder and guilty of conspiracy to commit robbery with a deadly weapon.

On June 22, 2009, appellant was sentenced to life imprisonment without parole for first degree felony murder, a concurrent twenty-year term for conspiracy to commit robbery with a dangerous weapon, and a concurrent five-year term for theft. All other counts were merged for purposes of sentencing.

Appellant filed a timely appeal and raises three questions, which we quote:

1. Did the trial court err in denying the Appellant's motion to suppress his statement?

2. Did the trial court err in instructing the jurors that they could find the Appellant guilty of second-degree felony murder if they found that he committed a murder in the commission of or attempt to commit a robbery?

3. Was the evidence insufficient to sustain the theft conviction and to permit sentencing under the statutory provision applicable to felony theft?

We answer the first question in the affirmative and questions two and three in the negative and, accordingly, remand to the circuit court for further proceedings.

## Factual Background and Proceedings Below

### 1. *The Carjacking/Auto Theft Trial*

During the evening of April 14, 2007, Officer Michael Trader of the Prince George's County Police Department was on the lookout for a silver Ford Focus that had been stolen earlier that day. Another officer, Corporal Damiean Lee, issued a radio call that the vehicle had been spotted. In separate vehicles, Officer Trader and Corporal Lee caught up with the Ford Focus, pulled behind it and attempted to effectuate a stop. The Ford Focus tried to flee, but eventually was boxed in by several officers in police vehicles, who forced it to stop. Appellant was the driver of the Ford Focus at the time of the stop. He and another male were removed from the vehicle and arrested.

Detective Marcos Rodriguez of the Prince George's County Police Department assisted in the investigation because he spoke both English and Spanish. Detective Rodriguez testified as to his four-hour custodial interview of appellant, which took place in Spanish. Over appellant's objection, the circuit court admitted the transcript of the interview and the statement appellant made to Detective Rodriguez. In that statement, appellant admitted that, on April 14, 2007, he had taken a car from a gas station and that the owner had left the keys in the car.

Corporal Damiean Lee testified that he was the first officer on April 14, 2007, to spot the stolen Ford Focus. According to

Corporal Lee, the Ford was eventually stopped by four to five police vehicles. At the time of the stop, appellant was "in the driver's seat and there was another Hispanic male in the passenger seat."

The State's final witness was Misael Pena, who had previously entered a guilty plea to the incident involving the Ford Focus. Pena testified that he and appellant were walking by a gas station in Hyattsville on the day in question. According to Pena, they saw a black man leave his keys in his car while he went to pay for his gas. Appellant told Pena to get in the car and they took off with appellant behind the wheel. The owner chased them on foot for a short distance, but soon gave up. According to Pena, it was appellant's idea to take the car.

After the State rested, appellant moved for judgment of acquittal on both counts for which he was being tried: carjacking and theft over $500. The circuit court granted the motion as to carjacking, but denied the motion as to felony theft. Appellant elected not to testify. Appellant renewed his motion for judgment of acquittal at the close of all of the evidence. On the issue of value, the State argued that the undisputed evidence showed that the vehicle was an operable 2006 Ford Focus and that the crime occurred in April 2007. The court denied the motion, ruling that the jury could find from the facts in evidence that, because the car "was obviously in good operating condition," it was worth over $500 at the time it was stolen. The jury convicted appellant of felony theft.

## 2. The Murder Trial

Appellant's murder trial began on February 9, 2009. The State's first witness was Detective Bernard Nelson of the Prince George's County Police Department. On April 14, 2007, Detective Nelson responded to a report of a shooting on New Hampshire Avenue. The victim had been transported to the Washington Hospital Center, where he was pronounced dead from one gunshot wound to the chest. Detective Nelson went to the hospital because, "upon moving [the victim] from the gurney, they found a projectile that apparently came, that

was found in his clothing, dropped out of his clothing." The bullet was admitted into evidence, without objection.

Detective Nelson then testified that a handgun was recovered from the Ford Focus, where it was located on the floorboard behind the driver's seat. Appellant was the driver of the vehicle in which the gun was located. The gun, a .38 caliber Rossi revolver, was operational and fully loaded. The gun was received into evidence without objection. Eleven live .38 caliber bullets were recovered from appellant's front pants pockets, during a search incident to arrest.

According to Detective Nelson, the results of the check of the license number of the vehicle from which appellant was apprehended revealed the owner to be Kenneth Thompson. The vehicle had been reported stolen earlier that day, shortly before the victim was shot. The shooting occurred "a couple of miles" from the gas station where the vehicle was taken and the vehicle was stopped by the police "four to five blocks" away from the gas station.

The parties stipulated that the victim, Carlos Eduardo Milian, died of a gunshot wound to the chest. The parties also stipulated that the bullet comparison test was inconclusive and that the DNA test results were not statistically significant. No latent prints were recovered from the Ford Focus. A latent print that was recovered from the handgun did not match either those of appellant or the other passenger in the vehicle, Pena.

The next witness for the State was Selvin Lima. Lima testified that, on April 14, 2007, he was waiting at a bus stop with the victim "when all of a sudden two guys came, and they tried to rob us, and they tried to take the chain my friend had. And my friend didn't want to give up his chain, and that is when one of them shot him." According to Lima, the smaller of the two men grabbed the chain and the taller man fired the shot that killed the victim. Lima identified the gun that was recovered from the Ford Focus as the gun that was used to shoot the victim.

Maynor Carcamo testified that he had been standing with his students across the street from the bus stop when he heard one of the students yell, "gun, look out there." Carcamo saw people arguing at the bus stop and saw "one grabbing another one." He then heard a gun shot and saw two "Latino males" running from the scene. He testified that they got into a Ford Focus, from which Carcamo obtained three of the tag numbers.

As he did at the auto theft trial, Corporal Lee testified regarding the stop of appellant on April 14, 2007, while appellant was driving the Ford Focus. Similarly, Corporal Trader described the stop of the vehicle and arrest of appellant on April 14, 2007.

Misael Pena testified that he was with appellant on April 14, 2007, when they stole a car from a Texaco gas station. With appellant driving, they went into the District of Columbia to drink some beer, but then returned to Prince George's County. After eating in a restaurant on New Hampshire Avenue, Pena and appellant "came across three guys that were standing" at a bus stop. According to Pena, appellant told him to take the chain from one of these individuals, but, when the man resisted, appellant shot him. Pena identified the gun that was used by appellant. Pena testified that, after the shooting, he and appellant drove back to the District of Columbia in the Ford Focus and were later apprehended by the police as they were riding around in Prince George's County. On cross-examination, Pena acknowledged that the police dropped certain murder charges against him in exchange for his cooperation against appellant. Pena also acknowledged that he entered into a plea bargain in which he agreed to plead guilty to conspiracy to commit robbery with a deadly weapon and receive a maximum sentence of twenty-five years.

Kenneth Thompson, the owner of the Ford Focus, testified at the murder trial that, on the day in question, he left his keys in his car when he went inside the station to pay for gasoline. While inside, his 2006 Ford Focus was stolen and

later recovered by the police that night in Hyattsville, a short driving distance from where it had been taken.

Detective Marcos Rodriguez testified at the murder trial regarding his interrogation of appellant. Appellant's statement to Detective Rodriguez was admitted into evidence over the appellant's objection. In the statement, which was translated from Spanish into English, appellant never admitted shooting the victim. However, he did say that Pena was the one who shot the victim after he refused to give up his gold chain and, after that, he and Pena then fled the scene in the stolen vehicle.

At the conclusion of the evidence, the court denied appellant's Motion for Judgment of Acquittal and the jury returned its guilty verdicts the following day. This appeal followed.

## Discussion

### 1. *The Suppression Motion—Waiver of Miranda*

Appellant contends that the suppression court erred in finding that appellant had validly waived his *Miranda*[1] rights. Appellant's theory is that, even though appellant initially may have waived his rights when Detective Rodriguez orally recited the *Miranda* warnings, and appellant orally responded that he wished to waive his *Miranda* rights, "Appellant's negative response when asked a second time by Rodriguez whether he would waive his right to counsel undermined the validity of the initial waiver itself."

The State rejoins that, after considering the videotape and transcript of appellant's statements to Detective Rodriguez, the Advice of Rights and Waiver Form completed and signed by appellant, and arguments of counsel, the trial court properly denied appellant's motion to suppress because he validly waived his *Miranda* rights. The State also maintains that the oral waiver is not invalidated as a result of the officer's repetition of part of a question in order to clarify whether

---

1. *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

appellant understood the question after appellant gave contradictory responses. According to the State, the officer was permitted under *Davis v. United States*, 512 U.S. 452, 114 S.Ct. 2350, 129 L.Ed.2d 362 (1994), to ask clarifying questions to an ambiguous response and to confirm that appellant understood his Spanish when appellant was asked to complete the Advice of Rights form. The evidence from the suppression hearing is summarized below.

Appellant was arrested on April 14, 2007, at approximately 8:45 p.m., and taken to the Criminal Investigation Division of the Prince George's County Police Department in Hyattsville, Maryland. He was placed in an interview room at approximately 12:52 p.m. At 2:01 a.m. on April 15, 2007, Detective Rodriguez entered the interview room. He said to appellant in Spanish: "Now I will read to you your rights under the law. If you don't understand anything I tell you, please stop me and I will explain it to you." The following transpired:

[Detective]: You have the right to remain silent. If you give up that right, anything you say can be used against you in court. Number two, **you have the right to speak to an attorney before being questioned and to have an attorney present during questioning. Okay?**

[Appellant]: **Mmm-huh.**

[Detective]: Number three, if you wish to have an attorney but you cannot afford an attorney, one can be provided to you at no cost. Number four: If you wish to answer questions without an attorney present, you ... you still ... you still have the right to stop answering questions at any moment. Do you understand your rights?

[Appellant]: Uh-huh.

[Detective]: Do you understand my Spanish?

[Appellant]: Uh-huh.

[Detective]: Okay. Tell me "yes" or "no" please.

[Appellant]: Yes.

[Detective]: Do you understand your rights?

[Appellant]: Uh-huh, yes, I understand.

[Detective]: Okay. Then mark your answer. Here it says "yes" and here it says "no" and your initials next to it.

[Appellant]: [grunts]

[Detective]: Okay. Can you mark your answer? Write?

[Appellant]: Yes.

[Detective]: Okay. **Then it says ... Do you want to make a statement ... (Unintelligible) other things, do you want to talk with me without having an attorney present?**

[Appellant]: [grunts]

**[Detective]: Tell me "yes" or "no".**

**[Appellant]: Yes.**

[Detective]: Okay. Have you been promised anything, have you been offered some kind of compensation or benefit or have you been threatened in any way to make a statement? That is, have I threatened you, have I offered anything, have I ... have I offered you some benefit? Mmmm?

[Appellant]: [grunts] no.

[Detective]: Answer me please. Yes or no?

[Appellant]: No.

[Detective]: Okay are you under the influence of alcohol or drugs at this moment?

[Appellant]: No.

[Detective]: No. Okay. Then what I need you to do, Angulo, is mark your answers here. Do you know how to read and write?

[Appellant]: Yes.

[Detective]: Okay. Mark here. That is that you understand your rights. You said yes, mark where it says yes.

[Appellant]: Uh-huh, yes.

[Detective]: Mark it. Here it says, do you understand your rights?

[Appellant]: Here ... my initial or what ...?

[Detective]: Initials are, for example, the two ...

[Appellant]: Yes.

[Detective]: ... the first letter of your ... Okay. Mark your answer "yes" or "no". Do you understand your rights?

[Appellant]: Yes.

[Detective]: **It says do you wish to make a statement without an attorney present? Do you want to talk to me right now?**

[Appellant]: **No.**

[Detective]: **Okay. Do you understand the question?**

[Appellant]: **Yes.**

[Detective]: **Okay. First you tell me yes and now you tell me no.** *Do you understand what the question is?*

[Appellant]: **Uh-huh. To make a ... a .... a ...**

[Detective]: **That is, do you want to talk to me right now without an attorney present?**

[Appellant]: **[unintelligible] yes I do.**

[Detective]: Okay. Your initials.

[Appellant]: Uh-huh.

Appellant argued to the motions court that, once appellant said "no" the second time he was asked whether he wished to make a statement without an attorney, Detective Rodriguez was required to cease questioning immediately under *Miranda* and *Edwards v. Arizona*, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981). The State countered that a valid *Miranda* waiver already had been obtained from appellant and, when Detective Rodriguez was confronted with an "ambiguous" response thereafter, he was permitted to ask clarifying questions under *Davis v. United States,* 512 U.S. 452, 114 S.Ct. 2350, 129 L.Ed.2d 362 (1994). The motions court took the matter under advisement.

In a written opinion, filed on February 4, 2009, the motions court denied the motion to suppress. In considering the question, the motions court had the benefit of the videotape of appellant's statements, the seventy-page transcript of appellant's interview and the Advice of Rights and Waiver form signed by appellant. The motions court made the following

findings in its written decision pertinent to the *Miranda* question:

> This court finds that [appellant] was ambiguous in asserting his *Miranda* rights. Initially he states that he will speak with the officer without an attorney, then subsequently says he will not. The court further finds that the Detective followed up with questions to clarify the [appellant's] intent as to his desire to talk with the Detective without counsel. In addition, at the time [appellant] and the Detective were going over the Advice of Rights and Waiver Form the only questions being asked of [appellant] were regarding his rights. There were no questions asked regarding the underlying investigation. Therefore, this court finds that the Detective was permitted to ask clarifying questions and [appellant] made a knowing and voluntary waiver of his *Miranda* rights.

 In reviewing the denial of a motion to suppress, this Court looks only to the record of the suppression hearing and does not consider the evidence admitted or arguments made at trial. *Knight v. State,* 381 Md. 517, 535, 850 A.2d 1179 (2004); *Christian v. State,* 172 Md.App. 212, 216, 914 A.2d 151 (2007). This Court also accepts the findings of fact made by the suppression court unless they are clearly erroneous and reviews those findings in the light most favorable to the prevailing party, in this case, the State. *Cooper v. State,* 163 Md.App. 70, 84, 877 A.2d 1095 (2005); *Conboy v. State,* 155 Md.App. 353, 361, 843 A.2d 216 (2004). "[A]n appellate court will give great deference to a hearing judge's determination and weighing of first-level findings of fact. It will not disturb either the determinations or weight given to them, unless they are shown to be clearly erroneous." *Longshore v. State,* 399 Md. 486, 498, 924 A.2d 1129 (2007); *see Williams v. State,* 188 Md.App. 78, 89–90, 981 A.2d 46 (2009). The suppression court's legal conclusions, however, are subject to our independent constitutional review. *Rush v. State,* 403 Md. 68, 83, 939 A.2d 689 (2008); *Wilson v. State,* 174 Md.App. 434, 439, 921 A.2d 881, *cert. denied,* 400 Md. 649, 929 A.2d 891 (2007).

■ In the case before us, appellant argues that, after initially waiving his rights, he later changed his mind when Detective Rodriguez asked him to sign a written waiver and said he did not wish to speak without a lawyer. According to appellant, "Rodriguez would not accept this change of heart and persisted in his efforts to obtain a waiver under the guise of 'clarification.' "

However, a review of the transcript reveals that the questioning was limited to clarification as to whether appellant understood his *Miranda* rights, all of which took place *before* any discussion regarding the criminal acts took place. Given the fact that appellant was being questioned in Spanish and the detective was unsure as to whether appellant understood what was being said to him, it was reasonable for him to ask "questions to clarify the defendant's intent as to his desire to talk with the Detective without counsel." When reading the interview transcript, patently, appellant could have been confused by the two-part question by the detective, which asked both if he wanted to make a statement and whether he wanted to talk with him. After appellant replied, "no," he was asked by the detective if he understood the question; appellant's response indicates that he believed he was being asked to *make a statement.* When Detective Rodriguez, by way of clarification, told appellant that he was being asked if he wished to talk with him, appellant readily repeated his initial response: he was willing to voluntarily speak to the detective without the presence of an attorney.

■ *Miranda* requires that, before undertaking any custodial interrogation, law enforcement personnel must deliver to a suspect the now familiar advisements, to wit:

[A] suspect must be warned prior to any questioning [1] that he has the right to remain silent, [2] that anything he says can be used against him in a court of law, [3] that he has the right to the presence of an attorney, and [4] that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires.

*State v. Luckett,* 413 Md. 360, 378, 993 A.2d 25 (2010), quoting *Miranda,* 384 U.S. at 479, 86 S.Ct. 1602. Then, "[*d* ]*uring the questioning,* if the individual states that he wants to speak with an attorney, there can be no further questioning until counsel has been provided or the suspect himself initiates further communication with the police." *Rush v. State,* 403 Md. at 83, 939 A.2d 689 (emphasis added); *Bryant v. State,* 49 Md.App. 272, 279, 431 A.2d 714 (1981), *cert. denied,* 456 U.S. 949, 102 S.Ct. 2020, 72 L.Ed.2d 474 (1982). This right is the result of the Supreme Court's holding in *Edwards v. Arizona,* 451 U.S. 477, 484, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981), in which the Court held that law enforcement officers must immediately cease questioning a suspect who has clearly asserted his right to have counsel present during custodial interrogation. The Supreme Court held, however, that police interrogators can reinitiate questioning if two weeks have elapsed since they ended the most recent interrogation. In *Edwards,* after initial questioning, the defendant made a request for counsel and questioning ceased. However, the next day, the police re-started interrogating him before an attorney could be provided, which was held to violate his rights.

The case before us is more similar to the Supreme Court's holding in *Davis v. United States,* 512 U.S. 452, 114 S.Ct. 2350, 129 L.Ed.2d 362 (1994), which set out the required analysis when an invocation of the right to counsel, after a valid *Miranda* waiver, is *ambiguous.* In *Davis,* after a sailor was beaten to death at the Charleston Naval Base, the investigation focused on the petitioner. As required by military law, the investigative agents advised him of the military equivalent of his *Miranda* rights before any substantive questioning. At the outset, the petitioner waived his rights to remain silent and to counsel, both orally and in writing. Approximately one hour into the interview, the petitioner said, "Maybe I should talk to a lawyer." The Naval investigators sought to clarify whether petitioner actually wanted a lawyer to be present. The petitioner then said, "No, I don't want a lawyer." After a break, the petitioner was re-advised of his rights and the interview continued. Eventually, the petitioner unequivocally

requested counsel and the interview ceased. 512 U.S. at 454, 114 S.Ct. 2350.

At his general court-martial, Davis moved to suppress the statements made during the interview, arguing that his initial comment, "Maybe I should talk to a lawyer," was a request for counsel and required the agents to cease the interrogation. The Military Judge denied the motion and the United States Court of Military Appeals affirmed. Noting that it had not previously squarely addressed the issue of what triggered *Edwards* and the development of varying approaches by the lower courts, the Supreme Court granted *certiorari* to provide guidance. 512 U.S. at 456, 114 S.Ct. 2350.

The Supreme Court began its analysis by noting that the applicability of the "prophylactic rule" of *Edwards* "requires courts to 'determine whether the accused *actually invoked* his right to counsel.'" 512 U.S. at 548, 114 S.Ct. 2396 (emphasis in original), *quoting in part Smith v. Illinois,* 469 U.S. 91, 95, 105 S.Ct. 490, 83 L.Ed.2d 488 (1984). The inquiry, the Supreme Court held, is an objective one and "the suspect must unambiguously request counsel." 512 U.S. at 459, 114 S.Ct. 2350. Further, a suspect "must articulate his desire to have counsel present sufficiently clearly that a reasonable police officer would understand the statement to be a request for an attorney. If the statement fails to meet the requisite level of clarity, *Edwards* does not require the officers to stop questioning the suspect." 512 U.S. at 459, 114 S.Ct. 2350.

The Supreme Court in *Davis* refused to expand *Edwards* "and require law enforcement officers to cease questioning immediately upon the making of an ambiguous or equivocal reference to an attorney." *Id.* The Supreme Court held "that, after a knowing and voluntary waiver of the *Miranda* rights, law enforcement officers may continue questioning *until and unless the suspect clearly requests an attorney.*" 512 U.S. at 461, 114 S.Ct. 2350 (emphasis added). There was no such request in the case before us.

2. *The Suppression Motion—Promise of Confidentiality*

Appellant's second argument is that Detective Rodriguez's assertions to him during the interview undermined the *Miranda* warnings and rendered all subsequent admissions involuntary. At pages 40–41 of the 70–page interrogation transcript, when Detective Rodriguez and appellant broached the subject of appellant's gang affiliation and the significance of the numbers 5–0–3, appellant expressed his reluctance to discuss "secrets of ours." We set forth the subject colloquy in great detail in order to give context to Detective Rodriguez's statement to appellant:

[Detective]: Are you brave?

[Appellant]: I am brave because I am here. I live, I've already lived all that. And now I am a leader and I can teach many people, to be . . . what I am.

[Detective]: And what is there now? What is there?

[Appellant]: What do you mean?

[Detective]: In the MS? I mean, what are the plans?

[Appellant]: The plans are to eliminate all those people.

[Detective]: For what reason?

[Appellant]: For the reason that . . . to cause panic now. That we are fed up with all those people ruin—who—who—who—are ruining everybody. I am a five zero three.

[Detective]: Five zero three, what is that?

[Appellant]: that is . . . they're three dots.

[Detective]: La Vida Loca?

[Appellant]: No, they're three dots that, if you want to harm someone, you do the harm to yourself.

[Detective]: What?

[Appellant]: If you want to provoke pain in me, you will feel it yourself. That is how God left me.

[Detective]: Five zero three.

[Appellant]: Yes.

[Detective]: I never heard that. What does it mean?

[Appellant]: A five to us means to be a dog. And the three on the three points of the trinity in the Bible.

[Detective]: What are the three points?

[Appellant]: No, well, um ... [inaudible] I don't know if I can be talking about it.

[Detective]: Well, I'm interested. why don't you tell me about it?

[Appellant]: What I do know is that ... I'm going to keep doing it.

[Detective]: What are you going to keep doing?

[Appellant]: I don't know, [inaudible] [3:14:32] of God.

[Detective]: But what are the three dots about, what is that?

[Appellant]: [Pause] They are secrets of ours. You can't say it.

[Detective]: *Why? Everything we talk about is going to stay here in this room.*

[Appellant]: That's a lie. A lot of people are listening here.

[Detective]: Maybe spirits.

[Appellant]: Spirits?

[Detective]: And the gringos who are outside don't understand Spanish, so that, the only one who can understand you is me.

Subsequently, at page 53 of the interrogation transcript, appellant acknowledged his complicity in the murder:

[Detective]: Remember, the only thing I'm looking for is the truth. That's the only thing I'm looking for. I'm not looking for culprits; I'm looking for the truth. And that's why I came to talk to you, to find the truth. And that's why I need to find the truth. What was it that occurred at that moment? What was it that happened? What went on? What happened then?

[Appellant]: Me, I already told you. The devil did it.

[Detective]: You told me "God."

[Appellant]: That yes, that I was there.

[Detective]: What was it that happened, Henry? Henry, what was it that happened? You know you can trust me. We two understand each other. We feel the spirit; because I feel the same spirit of peace in you. *And we are brothers. You can trust me.*

[Appellant]: He wanted to—he wanted to buy crack.

[Detective]: Hmm-hmm.

[Appellant]: And he wanted to test the weapon, to sell it to me.

[Detective]: Okay.

[Appellant]: And he . . . he got out of the car and I told him not to get out. Hey? You know what? No problem. And I tell him, "Look, that . . . hey . . . there's a . . . a . . . a . . . gold chain, on a stranger." "Okay," I say to him, "Are what, are you going to get it?" "Yes, I'm going to get it." So I told him, "Well, let's go." So he wanted to take it from him but the man wouldn't let him.

[Detective]: Hmm-hmm.

[Appellant]: He didn't want to. He didn't want to; in other words, his life for a piece of metal.

[Detective]: He didn't agree?

[Appellant]: So, he acted very wrong. Because he—what he should have done was grab it.

[Detective]: Of course.

[Appellant]: So yes, I was there because . . . because I was there to buy the weapon. So, the only thing that occurred to me, because there were police there, nearby.

[Detective]: Hmm-hmm.

[Appellant]: The police were there. And . . . I'm not lying, the police were near there. But, what I should have done was to turn him in, you understand. But I was an accomplice. And I got afraid. [D.E. #2 at 52–53](emphasis supplied)

Appellant contends that, "All admissions following Rodriguez' statement that 'Everything we talk about is going to

stay here in this room,' should have been suppressed by the trial court as the product of unconstitutional inducements."

The motions court rejected appellant's claim, ruling that, based on the totality of the circumstances, "the Detective's statements did not induce the defendant to make an incriminating statement or undermine the voluntariness of the statement."[2]

Appellant renews these contentions on appeal, arguing, "All admissions following Rodriguez' statement that 'Everything we talk about is going to stay here in this room,' should have been suppressed by the trial court as the product of unconstitutional inducements." The State disagrees, arguing that there were no express promises of confidentiality and that the statements did not affirmatively contradict the *Miranda* warnings.

"When a criminal defendant claims that his or her confession was involuntary because of a promise made to him or her by interrogating officers, the State must present evidence in order to refute the claim." *Knight v. State,* 381 Md. 517, 532, 850 A.2d 1179 (2004). The burden is on the State to prove voluntariness by a preponderance of the evidence. *Knight,* 381 Md. at 532, 850 A.2d 1179; *Winder v. State,* 362 Md. 275, 306, 765 A.2d 97 (2001). The determination of voluntariness is a mixed question of law and fact. *Winder,* 362 Md. at 310–11, 765 A.2d 97. Our review is *de novo.* *Knight,* 381 Md. at 535, 850 A.2d 1179.

In *Lee v. State,* 186 Md.App. 631, 975 A.2d 240 (2009), we reviewed the case law on voluntariness *after* a suspect has been given *Miranda* warnings, concluding that

---

**2.** In his memorandum opinion, the motions judge, in addressing the issue of whether there had been an impermissible promise or inducement, wrote, "Inducements that render a statement inadmissible must be strong enough to make the confession unreliable and directly impact the accused or the crime charged. Based on the totality of the circumstances that [sic] Detective's statements did not induce the defendant to make an incriminating statement or undermine the voluntariness of the statement."

[w]e agree that an express promise of confidentiality is inconsistent with the *Miranda* warning that "anything [a suspect] says can be used against [the suspect] in a court of law." *Miranda*, 384 U.S. at 479 [86 S.Ct. 1602]. When a police officer makes such a promise of confidentiality, it can nullify the *Miranda* warnings. If the totality of the circumstances shows that the suspect was led to believe that his or her statement would not go beyond the interrogation room, a subsequent statement is not given in compliance with the requirements of *Miranda.*

*Id.* at 653, 975 A.2d 240.

Noting that some courts have indicated that misstatements or deception by a police officer *after* a valid waiver does not invalidate the prior waiver, (*See, e.g., U.S. v. Bezanson–Perkins,* 390 F.3d 34, 41 (1st Cir., 2004)), we expressed our concurrence with the proposition that the timing of the police deception is not dispositive; rather, the central issue is whether the deception misleads the suspect regarding the rights explained in the *Miranda* warnings and deprives the suspect "of knowledge essential to his ability to understand the nature of his rights and the consequences of abandoning them." If a voluntary decision to speak is " 'made with full awareness and comprehension of all the information *Miranda* requires the police to convey, a waiver is valid.' " (Citing *Moran v. Burbine,* 475 U.S. 412, 424, 106 S.Ct. 1135, 89 L.Ed.2d 410 (1986)).

We then distinguished *Lee* from other decisions wherein convictions were overturned because the interrogating officers advised suspects that their statements would be kept confidential:

Here, unlike the cases cited, *supra,* there was no express promise that the defendant's statements would remain confidential or that the statements were "off-the-record." Detective Schrott merely responded to appellant's query regarding whether the interrogation was being recorded by stating: "This is between you and me, bud. Only me and you are here, all right? All right?" As the State notes, this statement did not reflect any agreement of confidentiality.

Rather, it was an equivocal response that was designed, not to establish a confidential relationship, but to deflect appellant's suggestion that he was aware that the interrogation was being recorded. We view Detective Schrott's response as sidestepping appellant's question regarding whether the interrogation was being recorded.

*Id.* at 654, 975 A.2d 240.

The Court of Appeals granted *certiorari*, 411 Md. 355, 983 A.2d 431 (2009), to address, *inter alia*, the following issue:

Whether the interrogating officer made a promise of confidentiality, violated the protections of *Miranda v. Arizona*, and induced [ ] an involuntary statement when, an hour into an interrogation in which Petitioner continually denied involvement in the shooting, the officer stated: "This is between you and me, bud. Only you and me here, all right? All right?"

In its recent pronouncement in *Lee v. State*, 418 Md. 136, 12 A.3d 1238 (2011), the Court of Appeals rejected the State's argument that the interrogating detective's assertion amounted to "something less than an assurance of confidentiality because it was offered in response to Petitioner's uttering, 'this is being recorded.'" 418 Md. at 156, 12 A.3d 1238. The Court continued:

The State, however, ignores the conspicuous implication of the phrase Schrott used. Intentionally or not, the detective's utterance, "this is between you and me, bud," communicated more than a mere "yes" or "no" reply to a query about the presence of a recording device. Indeed, in line with our interpretation here, the Circuit Court found that Schrott's statement "leaves the Defendant to believe that the conversation is just between the two of them. . . ." It is of no consequence that Detective Schrott committed the *Miranda* violation only once, rather than multiple times as in some of the cases we have discussed. The violation, once committed, was enough to undermine the warning that anything Petitioner said to the detective could and would be used against him in court. In this regard we grant the

officer no greater leave than we would had he made the error while advising Petitioner in the first instance. *See Luckett,* 413 Md. at 384, 993 A.2d at 38–39 (holding that the officer's warnings, which included both correct and incorrect statements concerning the scope of the *Miranda* protections, fell far short of properly advising the defendant of his rights under *Miranda*).

*Id.* at 156–57, 12 A.3d 1238.

Accordingly, the Court of Appeals held "that Detective Schrott's affirmative misrepresentation mid-way through the interrogation that Petitioner's statements were 'just between you and me, bud. Only you and me are in here,' rendered Petitioner's prior *Miranda* waiver ineffective for all purposes, *going forward.*" (Emphasis added). Thus, because the State made substantive use of Lee's incriminating statement(s) made subsequent to the detective's misrepresentation, the court granted him a new trial during which these statements may not be used against him in the State's case-in-chief, but may be used for impeachment purposes. *Id.* at 157–58, 12 A.3d 1238.

The teachings of *Lee* compel us ineluctably to the conclusion that the motion court's ruling that Detective Rodriguez' statement did not eviscerate the *Miranda* warning against self-incrimination cannot withstand constitutional muster. The interrogation transcript reflects that appellant's admissions regarding the offenses at issue were made subsequent to the assurances by Detective Rodriguez that "everything we talk about is going to stay here in this room." These assurances accorded appellant by Detective Rodriguez ran afoul of the Fifth Amendment constitutional guarantee against self-incrimination embodied in *Miranda* as implemented through the administration of the standard warnings at the inception of custodial interrogations. The statements constituted express promises of confidentiality and are inconsistent with the *Miranda* warning that "anything [a suspect] says can be used against [the suspect] in a court of law." In *Lee,* the Court rejected the proposition that the detective's response

was merely his way of sidestepping Lee's question regarding whether the interrogation was being recorded. The State, in the case at hand, contends that Detective Rodriguez' statement that everything discussed would "stay here in this room," is ameliorated by the explanation that the statement referred only to statements made by appellant about MS gang secret lingo, *i.e.,* "the three dots," (Five zero three, the three points of Trinity in the Bible), a "secret of ours." The State also propounds the view that Rodriguez' statement was merely in response to appellant's concerns that "a lot of people are listening here." In other words, Rodriguez' promise of confidentiality referred to not divulging what was being said to the "gringos," outside of the interview room, who did not understand Spanish. As we see it, the rationale advanced by appellant is equally unavailing as that posited by the State in *Lee.* We hold that the promises of confidentiality made by Detective Rodriguez rendered appellant's prior *Miranda* waiver ineffective as to appellant's incriminating statements made after the detective's assurances. We shall therefore reverse appellant's conviction and grant a new trial during which these subsequent statements may not be used against him in the State's case-in-chief, but may be used for impeachment purposes.

### 3. *The Jury Instruction on Second Degree Felony Murder*

Notwithstanding, that we remand the instant case for a new trial, we shall address appellant's remaining issues for guidance at any further proceedings. Appellant was convicted of both first and second-degree felony murder. He was sentenced to life imprisonment for first-degree felony murder. Appellant contends on appeal that the trial court erred in instructing the jury regarding second-degree felony murder because both felony murder convictions were based on the same predicate offenses, robbery and attempted robbery. Appellant concedes that he did not object to the trial court's instructions as to either felony murder jury instruction on this

ground.[3] Maryland Rule 4–325(e) provides:

> No party may assign as error the giving or the failure to give an instruction unless the party objects on the record promptly after the court instructs the jury, stating distinctly the matter to which the party objects and the grounds of the objection.

Appellant nevertheless asks us to review the instruction under the plain error doctrine, noting that the instruction given in this case is inconsistent with our decision in *Goldsberry v. State*, 182 Md.App. 394, 957 A.2d 1110, *cert. granted*, 406 Md. 744, 962 A.2d 371 (2008). In *Goldsberry*, we held that the same felony cannot serve as a predicate for both first and second-degree felony murder. *Id.* at 405–07, 957 A.2d 1110. We further held that, when the legislature has enumerated a felony for a murder in the first degree, that felony cannot also serve as a predicate for the second-degree offense. *Id.* at 407–08, 957 A.2d 1110.

We decline appellant's invitation to engage in plain error review in this case for several reasons. First, appellant was convicted of first-degree felony murder and he has not challenged his conviction or life sentence for that offense. As a consequence, even if the instruction was error, appellant was not prejudiced by the giving of that instruction; hence, there is no need to exercise plain error review. *Moore v. State*, 194 Md.App. 327, 374, 4 A.3d 96 (2010) (Defendant was not prejudiced by an erroneous instruction on unlawful act manslaughter because he was convicted of a greater offense, first-degree felony murder); *see also Robinson v. State*, 410 Md. 91, 110–11, 976 A.2d 1072 (2009) (declining to exercise plain error review to unpreserved claim of an alleged Sixth Amendment violation when the defendant's family was excluded from trial). Second, the second-degree felony murder instruction given in this case was in accord with the pattern jury instruction. MPJI–Cr. 4:17.7.2(B), at pp. 256.7. As a consequence, we

---

3. Appellant did object to the felony murder instructions on the ground that the instructions were not generated by the evidence. That issue has not been raised on appeal.

need not explore how a jury should be instructed when second-degree felony murder is charged to a jury.

■■■ Third, our recent decision in *Goldsberry* makes further review of this area of the law unnecessary. We ordinarily do not exercise plain error review when we have fully explicated the law on a particular subject in another case. *Morris v. State*, 153 Md.App. 480, 518–20, 837 A.2d 248 (2003). What we stated in *Morris* applies here: "The contention now urged upon us has no value as an expository vehicle. The legal issue involved lies in a field that has already been thoroughly ploughed," *id.* at 520, 837 A.2d 248, at least by us. The Court of Appeals granted *certiorari* in *Goldsberry* and the case was argued in the Court of Appeals on June 4, 2009. Until the Court of Appeals rules, there is no need for us to delve further into such matters in a case when the issue is not preserved for appeal.

### 4. *Legal Sufficiency of the Theft Conviction*

Appellant's final contention is that the evidence was legally insufficient to support his conviction for felony theft. According to appellant, because the owner of the vehicle did not testify at his automobile theft trial, there was no proof of ownership of the vehicle. For largely the same reason, and because no witness testified as to the value of the vehicle, appellant contends he could be sentenced, if at all, only for misdemeanor theft.

The State disagrees, noting that there was ample evidence, direct and circumstantial, that appellant possessed property of another and that it was taken from an owner who had an interest in or possession of the property. The State also contends that a jury rationally could find that, at the time of the offense in April 2007, an operable 2006 Ford Focus was worth more than $500.

The standard of review for appellate review of evidentiary sufficiency is whether any rational trier of fact could have found the essential elements of the crimes beyond a reasonable doubt. We view the evidence in the light most favor-

able to the prosecution. We give due regard to the fact finder's finding of facts, its resolution of conflicting evidence, and, significantly, its opportunity to observe and assess the credibility of witnesses.

*Ashton v. State,* 185 Md.App. 607, 613, 971 A.2d 965 (2009), *quoting Dukes v. State,* 178 Md.App. 38, 42, 940 A.2d 211 (2008) (citations and internal quotations omitted). The record need only show that the verdict was supported with direct or circumstantial evidence that showed, or "supported a rational inference of facts which could fairly convince a trier of fact of the defendant's guilt of the offense charged beyond a reasonable doubt." *State v. Albrecht,* 336 Md. 475, 479, 649 A.2d 336 (1994).

■ In a theft case, proof of ownership is an essential element of the offense. *Wersten v. State,* 228 Md. 226, 228–29, 179 A.2d 364 (1962). Under the consolidated theft statute, an owner "means a person, other than the offender, who has an interest in or possession of property . . . and, without whose consent the offender has no authority to exert control over the property." Md.Code (2002 Repl. Vol., 2010 Supp.), Crim. Law (C.L.) § 7–101(h).

■ The indictment charged appellant with theft of "a 2006 Ford Focus of Kenneth Maurice Thompson." Although Thompson did not testify at the auto theft trial (he did, however, testify at the murder trial), there was a plethora of evidence before the jury from which it could conclude that appellant had stolen Thompson's vehicle. For example, Officer Trader testified that, during the evening of April 14, 2007, he was on lookout for a silver Ford Focus that had been reported stolen earlier that day. Officer Trader and Corporal Lee testified that appellant was the driver of the Ford Focus when it was stopped by the police, after attempting to flee. Misael Pena testified that he and appellant stole the Ford Focus from a gas station earlier that day, when they saw that the driver of the Ford had left the keys in the vehicle after going into the station to pay for his gasoline, and that the driver gave chase on foot when he saw his car being taken. Both Pena and

appellant were in the vehicle at this point, with appellant behind the wheel. Pena and appellant were caught later that same day, again, with appellant behind the wheel. Based on this evidence, the jury reasonably could conclude that appellant committed a theft of a motor vehicle. *Grant v. State,* 318 Md. 672, 680, 569 A.2d 1237 (1990) ("exclusive possession of recently stolen goods permits an inference that the possessor is a thief.") (Footnote omitted); *Offutt v. State,* 55 Md.App. 261, 264–65, 463 A.2d 876 (1983)(same); *see also Myers v. State,* 165 Md.App. 502, 529–30, 885 A.2d 920 (2005) (for purposes of theft statute, possession may be joint with another thief); *Folk v. State,* 11 Md.App. 508, 518, 275 A.2d 184 (1971) (same).

 Finally, appellant contends that, because the owner did not testify, there was no evidence of the vehicle's value. He posits, as a consequence, that he could only have been sentenced for misdemeanor theft, relying on Cr.L. § 7–103(e) ("when it cannot be determined whether the value of the property or service is more or less than $500 under the standards of this section, the value is deemed to be less than $500.").[4]

 For purposes of the theft statute, value means "the market value of the property or service at the time and place of the crime." Cr.L. § 6–103(a)(1). To be sure, there was no direct evidence of the value of the 2006 Ford Focus. *Cf. Stone v. State,* 178 Md.App. 428, 442, 941 A.2d 1238 (2008) ("[T]he owner of personal property is presumptively qualified to testify about the value of his goods.") But there was sufficient circumstantial evidence from which the jury could find, beyond a reasonable doubt, that the motor vehicle—an operable 2006 Ford Focus—was worth more than $500, on April 14, 2007. "Circumstantial evidence is sufficient to support a conviction

---

4. At the time of appellant's trial, the felony threshold for theft was $500. Md.Code., Crim. Law (CL), § 7–104(g) (2002 Rep. Vol.). Effective October 1, 2009, the legislature amended this provision to raise the threshold to $1,000. Chapter 655, Acts 2009, as codified in Cr.L. § 7–104(g) (2010 Supp.).

in this State." *Veney v. State*, 251 Md. 182, 201, 246 A.2d 568 (1968). As we held in *Hall v. State*, 119 Md.App. 377, 393, 705 A.2d 50 (1998): "Circumstantial evidence is entirely sufficient to support a conviction, provided the circumstances support rational inferences from which the trier of fact could be convinced beyond a reasonable doubt of the guilt of the accused." *Accord, Painter v. State*, 157 Md.App. 1, 11, 848 A.2d 692 (2004) (holding that circumstantial evidence was legally sufficient to support a theft conviction).

Appellant's reliance on *Proctor v. State*, 49 Md.App. 696, 435 A.2d 484 (1981), is misplaced. In that case, we held that the defendant was erroneously sentenced for felony theft when there was *no evidence* of the value of guns stolen from a house and remanded for re-sentencing. *Id.* at 703–05, 435 A.2d 484. Although a jury might be unable to ascertain the value of "guns" without the testimony of someone knowledgeable about their value, we are convinced that a jury reasonably may conclude that, in April 2007, a one year-old operable Ford Focus was worth more than $500.

**JUDGMENTS OF THE CIRCUIT COURT FOR PRINCE GEORGE'S COUNTY REVERSED; CASE REMANDED TO THAT COURT FOR FURTHER PROCEEDINGS NOT INCONSISTENT WITH THIS OPINION.**

**COSTS TO BE PAID BY PRINCE GEORGE'S COUNTY.**